[No. G046516. Fourth Dist., Div. Three. Mar. 18, 2013.]

GENEVIEVE WEST, Plaintiff and Appellant, v.
JPMORGAN CHASE BANK, N.A., as Receiver, etc., Defendant and
Respondent.

**COUNSEL**

Genevieve West, in pro. per., for Plaintiff and Appellant.

AlvaradoSmith, John M. Sorich, S. Christopher Yoo, Yunnie Youn Ahn and Jenny L. Merris for Defendant and Respondent.

**OPINION**

**FYBEL, J.—**

### INTRODUCTION

As authorized by Congress, the United States Department of the Treasury implemented the Home Affordable Mortgage Program (HAMP) to help homeowners avoid foreclosure during the housing market crisis of 2008. "The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt." (*Bosque v. Wells Fargo Bank, N.A.* (D.Mass. 2011) 762 F.Supp.2d 342, 347.)

After her home loan went into default, plaintiff Genevieve West agreed to a trial period plan (TPP), a form of temporary loan payment reduction under HAMP, from defendant JPMorgan Chase Bank, N.A. (Chase Bank),[1] which had acquired her loan from the original lender. West complied with the terms of the TPP, and timely made every reduced monthly payment on her loan during the trial period and afterwards. Nonetheless, Chase Bank denied West a permanent loan modification, and West's home was sold at a trustee's sale just two days after Chase Bank told her, so West alleged, that no foreclosure sale was scheduled.

West brought this lawsuit alleging fraud, breach of written contract, promissory estoppel, and other causes of action, against Chase Bank. The trial court sustained without leave to amend Chase Bank's demurrer to the third amended complaint, and West appealed from the subsequent judgment. We hold that West stated causes of action for fraud, negligent misrepresentation, breach of written contract, promissory estoppel, and unfair competition, and therefore reverse the judgment on those causes of action. We affirm only on the causes of action for conversion, to set aside or vacate void trustee sale, for slander of title, and to quiet title.

In holding that West stated a cause of action for breach of written contract, we agree with the analysis and interpretation of HAMP presented in the recent opinion of the United States Court of Appeals for the Seventh Circuit in *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547, 556–557 (*Wigod*). Core to our decision is the court's conclusion in *Wigod, supra,* 673 F.3d at page 557, that when a borrower complies with all the terms of a TPP, and the borrower's representations remain true and correct, the loan servicer must offer the borrower a permanent loan modification. As a party to a TPP, a borrower may sue the lender or loan servicer for its breach. (*Id.* at p. 559, fn. 4.) Because West complied with all the terms of the TPP, Chase Bank had to offer her a permanent loan modification.

## HAMP

To explain HAMP, we quote extensively from *Wigod, supra,* 673 F.3d at pages 556–557:

"In response to rapidly deteriorating financial market conditions in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765. The centerpiece of the Act

[1] Chase Bank appeared as JPMorgan Chase Bank, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank from the Federal Deposit Insurance Corporation, acting as receiver for Washington Mutual Bank.

was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures.' 12 U.S.C. § 5219(a). Congress also granted the Secretary the authority to 'use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures.' *Id.*

"Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure. The Secretary negotiated Servicer Participation Agreements (SPAs) with dozens of home loan servicers . . . . Under the terms of the SPAs, servicers agreed to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program. In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives. The SPAs stated that servicers 'shall perform the loan modification . . . described in . . . the Program guidelines and procedures issued by the Treasury . . . and . . . any supplemental documentation, instructions, bulletins, letters, directives, or other communications . . . issued by the Treasury.' In such supplemental guidelines, Treasury directed servicers to determine each borrower's eligibility for a modification by following what amounted to a three-step process:

"First, the borrower had to meet certain threshold requirements, including that the loan originated on or before January 1, 2009; it was secured by the borrower's primary residence; the mortgage payments were more than 31 percent of the borrower's monthly income; and, for a one-unit home, the current unpaid principal balance was no greater than $729,750.

"Second, the servicer calculated a modification using a 'waterfall' method, applying enumerated changes in a specified order until the borrower's monthly mortgage payment ratio dropped 'as close as possible to 31 percent.'

"Third, the servicer applied a Net Present Value (NPV) test to assess whether the modified mortgage's value to the servicer would be greater than the return on the mortgage if unmodified. The NPV test is 'essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure.' [Citation.] If the NPV result was negative—that is, the value of the modified mortgage would be lower than the servicer's expected return after foreclosure—the servicer was not obliged to offer a modification. If the NPV was positive, however, the

Treasury directives said that 'the servicer MUST offer the modification.' Supplemental Directive 09-01. [¶] . . . [¶]

"Where a borrower qualified for a HAMP loan modification, the modification process itself consisted of two stages. After determining a borrower was eligible, the servicer implemented a Trial Period Plan (TPP) under the new loan repayment terms it formulated using the waterfall method. The trial period under the TPP lasted three or more months, during which time the lender 'must service the mortgage loan . . . in the same manner as it would service a loan in forbearance.' Supplemental Directive 09-01. After the trial period, if the borrower complied with all terms of the TPP Agreement—including making all required payments and providing all required documentation—and if the borrower's representations remained true and correct, *the servicer had to offer a permanent modification.* See Supplemental Directive 09-01 ('If the borrower complies with the terms and conditions of the [TPP], the loan modification will become effective on the first day of the month following the trial period . . . .').'' (Fourth ellipsis & italics added, fn. omitted.)

In *Wigod, supra,* 673 F.3d at pages 576–586, the Seventh Circuit Court of Appeals concluded HAMP does not preempt or otherwise displace state law causes of action. The court also recognized a borrower may assert state law claims, such as breach of contract, based directly on a TPP agreement because the borrower is in direct privity with the lender or loan servicer. (*Wigod, supra,* at p. 559 & fn. 4.) We do not address whether HAMP creates a private right of action because West has asserted only California state law claims.

· ALLEGATIONS

West's third amended complaint alleged the following facts.

West obtained an adjustable rate home loan in the sum of $645,000, secured by a deed of trust on her home. The deed of trust, which was recorded in September 2006, named Washington Mutual Bank, F.A. (Washington Mutual), as the lender and beneficiary, California Reconveyance Company as the trustee, and West as the borrower. In 2008, Chase Bank acquired Washington Mutual and purchased certain of its assets, including West's loan.

West failed to make payments on the home loan. As a consequence, a notice of default and election to sell under the deed of trust was recorded in March 2009. According to the notice of default, West was $17,795.91 in arrears as of March 17, 2009.

In April 2009, a substitution of trustee was recorded. It named Quality Loan Service Corporation (QLSC) as trustee in place of California Reconveyance Company.

In July 2009, Washington Mutual informed West she had been approved for a TPP, which Washington Mutual called a "Trial Plan Agreement." The approval letter stated: "Since you have told us you're committed to pursuing a stay-in-home option, you have been approved for a Trial Plan Agreement. If you comply with all the terms of this Agreement, we'll consider a permanent workout solution for your loan once the Trial Plan has been completed." In August 2009, West entered into the Trial Plan Agreement with Washington Mutual. The Trial Plan Agreement required West to make an initial payment of $1,931.86 by August 1, 2009, and additional payments in that amount on September 1 and October 1. The Trial Plan Agreement stated: "If you do not make your payments on time, or if any of your payments are returned for nonsufficient funds, this Agreement will be in breach and collection and/or foreclosure activity will resume."

West made all three payments under the Trial Plan Agreement and continued thereafter to make monthly payments in the required amount. In January 2010 and again in March 2010, Chase Bank confirmed receipt of documents that West had submitted in support of her request for a permanent loan modification under HAMP. In the letters confirming receipt of those documents, Chase Bank advised West to "continue to make your trial period payments on time."

By letter dated April 5, 2010, Chase Bank notified West that "we have determined that you do not qualify for a modification through the Making Home Affordable ('MHA') modification program or through other modification programs offered by Chase at this time." Chase Bank's determination was based on a calculation of West's "Net Present Value" (NPV) under a formula developed by the Department of the Treasury. The letter stated: "If we receive a request from you within thirty (30) calendar days from the date of this letter, we will provide you with the date the NPV calculation was completed and the input values noted below. If, within thirty (30) calendar days of receiving this information you provide us with evidence that any of these input values are inaccurate, and those inaccuracies are material, for example a significant difference in your gross monthly income or an inaccurate zip code, we will conduct a new NPV evaluation. While there is no guarantee that a new NPV evaluation will result in the owner of your Loan approving a modification, we want to ensure that the NPV evaluation is based on accurate information."

On April 8, 2010, West "and or" her representative contacted Chase Bank, informed the bank it had used outdated financial information, and requested a "re-evaluation" (boldface & underscoring omitted) using updated financial information. Chase Bank did not send West the NPV data and input values that she had requested.

On May 24, 2010, West again informed Chase Bank that it had used outdated financial information and that she would submit "updated financial information, and any other information necessary to make the input data accurate." West alleged: "On or about May 24, 2010, [West] and or her representative conducted a conference call with the loan modification department of CHASE BANK, who [sic] agreed and promised [West] that [she] could resubmit her updated financial data for re-evaluation for HAMP modification solutions, and that there was no foreclosure sale date or sale scheduled."[2] (Boldface & underscoring omitted.)

Also on May 24, West made her 10th reduced payment of $1,931.86, which Chase Bank rejected and returned to her.

Although Chase Bank had told West no foreclosure sale had been scheduled, her home was sold at a trustee's sale conducted on May 26, 2010. "In violation of its promises and said letter, and HAMP rules (and Supplemental Directives), two (2) days later, CHASE BANK secretly, sold [West]'s home, on May 26,[]2010 during the re-evaluation period. CHASE BANK issued letters dated May[]20, 2010, received May 24, 2010, rejecting [West]'s 10th payment . . . , made pursuant to the continuing forbearance agreement."

A trustee's deed upon sale was recorded on June 10, 2010. The deed identified Green Island Holdings, LP, as the grantee, and recited, "[s]aid property was sold by said Trustee at public auction on 5/26/2010 at the place named in the Notice of Sale . . . ."

On May 28, 2010, two days after the trustee's sale, Chase Bank's homeownership preservation office sent West a letter telling her: "More and more Americans are struggling to keep up with their mortgage payments. If you are experiencing financial difficulty, you have a variety of options that might help you get back on track, and keep you out of foreclosure." The letter invited West to meet with "specialists from Chase" at a "local event" to "work out the best solution to your current needs."

---

[2] West also asserts that during the conference call, she was told "not to worry, that her 'payments would be going down $200 from $1931.86 to about $1731.86.' " (Italics omitted.) That assertion is based on a declaration West submitted in opposition to Chase Bank's demurrer to the third amended complaint, which did not allege Chase Bank represented that West's payments would be reduced.

On August 18, 2010, nearly three months after the trustee's sale, the "Chase Fulfillment Center" sent West information about the Home Affordable Foreclosure Alternatives (HAFA) program. The letter stated: "HAFA is a United States Treasury program providing financial incentives to servicers and eligible borrowers working together on foreclosure alternatives, such as a short sale or deed-in-lieu. These alternatives may provide a more favorable outcome than a foreclosure sale by avoiding extended vacancy periods and costly foreclosures. [¶] If you are interested in the requirements for participating in HAFA, please sign the enclosed Borrower Request for HAFA Consideration and return it to the following address or fax number . . . ."

### PROCEDURAL HISTORY

West filed the initial complaint in November 2010. A series of demurrers and amendments resulted in the third amended complaint, which asserted these causes of action: fraud (first cause of action); negligent misrepresentation (second cause of action); conversion (third cause of action); set aside or vacate void trustee sale (fourth cause of action); unfair business practices under Business and Professions Code section 17200 et seq. (fifth cause of action); slander of title (sixth cause of action); breach of written contract (seventh cause of action); verified quiet title (10th cause of action); and promissory estoppel (11th cause of action).

Chase Bank demurred to the third amended complaint on the ground none of the causes of action stated facts sufficient to state a cause of action. Chase Bank filed a request for judicial notice in support of its demurrer. West opposed the demurrer and also filed a request for judicial notice.

The trial court sustained Chase Bank's demurrer in its entirety without leave to amend. The court granted West's request for judicial notice, and, while no ruling on Chase Bank's request for judicial notice appears in the record, the court cited Chase Bank's request in the minute order sustaining the demurrer. In that minute order, the trial court noted: "This case has now been pending for over one year and . . . West has had four opportunities to properly state a claim and has failed to do so, despite the Court specifically pointing out the same or similar problems with the Complaint on previous Demurrers." An order sustaining the demurrer without leave to amend, and a judgment against West and in favor of Chase Bank, were entered on January 3, 2012.

### STANDARD OF REVIEW

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, . . . [w]e give the complaint a reasonable

interpretation, reading it as a whole and its parts in their context. [Citation.] Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865 [62 Cal.Rptr.3d 614, 161 P.3d 1168].) We independently review a ruling on a demurrer to determine whether the pleading alleges facts sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].)

## DISCUSSION

### I.

### Fraud and Negligent Misrepresentation Causes of Action

West asserted fraud in the first cause of action and negligent misrepresentation in the second cause of action. In the fraud cause of action, West alleged that starting on August 6, 2009, Chase Bank made false representations in the Trial Plan Agreement and "verbally" that she was granted "a continuing Making Home Affordable (HAMP) Trial Modification, and or forbearance agreement, during the re-evaluation of the HAMP Modification." She alleged that Chase Bank concealed from her "the fact that there was a foreclosure sale date pending against the subject Property, and that it did intend to [foreclose] during the re-evaluation period."

The elements of fraud are (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant knew the representation was false at the time it was made; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) The elements of negligent misrepresentation are the same except for the second element, which for negligent misrepresentation is the defendant made the representation without reasonable ground for believing it to be true. (*Wells Fargo Bank, N.A. v. FSI, Financial Solutions, Inc.* (2011) 196 Cal.App.4th 1559, 1573 [127 Cal.Rptr.3d 589]; *National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50 [89 Cal.Rptr.3d 473].)

Chase Bank argues the trial court was correct to sustain the demurrer to those causes of action without leave to amend because West did not allege (1) fraud with the required particularity, (2) justifiable reliance, and (3) causation.

## A. *Specificity*

■ Fraud must be pleaded with specificity rather than with " 'general and conclusory allegations.' " (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184 [132 Cal.Rptr.2d 490, 65 P.3d 1255].) The specificity requirement means a plaintiff must allege facts showing how, when, where, to whom, and by what means the representations were made, and, in the case of a corporate defendant, the plaintiff must allege the names of the persons who made the representations, their authority to speak on behalf of the corporation, to whom they spoke, what they said or wrote, and when the representation was made. (*Lazar v. Superior Court, supra*, 12 Cal.4th at p. 645.)

We enforce the specificity requirement in consideration of its two purposes. The first purpose is to give notice to the defendant with sufficiently definite charges that the defendant can meet them. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660].) The second is to permit a court to weed out meritless fraud claims on the basis of the pleadings; thus, "the pleading should be sufficient ' "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' " (*Id.* at pp. 216–217.)

West met that specificity requirement. She alleged quite specifically that Chase Bank made misrepresentations in the Trial Plan Agreement, in the April 5, 2010 letter, and in telephone conferences on April 8 and May 24, 2010. Both the Trial Plan Agreement and the April 5 letter were attached to the third amended complaint. The Trial Plan Agreement was sent to West on July 24, 2009, by a Washington Mutual loan workout specialist identified as Russell Buelna.

West alleged that, in the April 5, 2010 letter, Chase Bank falsely represented that it would reevaluate her case and send her the NPV input data if she so requested within 30 days. The April 5 letter is from the Chase Fulfillment Center and, though the letter does not identify the preparer, West did not have to plead that information because it was uniquely within Chase Bank's knowledge. (*Committee on Children's Television, Inc. v. General Foods Corp., supra*, 35 Cal.3d at p. 217; see *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248 [129 Cal.Rptr.3d 874] [" 'While the precise identities of the employees responsible . . . are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents.' "].)

West alleged that on April 8, 2010, she spoke with a supervisor in the loan modification department of Chase Bank, and, on May 24, 2010, spoke with

someone in that department. She specifically described the misrepresentations allegedly made during those conferences and alleged the misrepresentations were communicated by telephone. She alleged that, in a telephone call on May 24, 2010, a Chase Bank representative told her she "could resubmit her updated financial data for re-evaluation for HAMP modification solutions, and that there was no foreclosure sale date or sale scheduled." (Boldface & underscoring omitted.) Her allegation of the persons who made the alleged misrepresentations was sufficient to give notice to Chase Bank of the charges. The identification of the Chase Bank employees who spoke with West on those dates is or should be within Chase Bank's knowledge.

### B. *Justifiable Reliance*

■ " 'Besides actual reliance, [a] plaintiff must also show "justifiable" reliance, i.e., circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation.' [Citation.] The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience. [Citation.] ' "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." [Citations.]' [Citation.]" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864–865 [68 Cal.Rptr.3d 828].) "Reliance can be proved in a fraudulent omission case by establishing that 'had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved differently.' " (*Boschma v. Home Loan Center, Inc., supra*, 198 Cal.App.4th at pp. 250–251.)

West alleged in the third amended complaint that she "justifiably relied [on] the representations made by CHASE BANK, on the phone, and in its letters" and, "[a]t all related times, Defendants knew or should have known that Plaintiff would justifiably rely on its representations made in writing, and on the phone."

Chase Bank argues those allegations did not satisfy the justifiable reliance requirement because (1) the Trial Plan Agreement makes no promise of a permanent loan modification agreement and (2) the April 5, 2010 letter informed West that Chase Bank had determined she did not qualify for a permanent loan modification.

The Trial Plan Agreement represented only that Chase Bank would reevaluate West's application for a permanent loan modification if West made all payments as scheduled. But the April 5, 2010 letter stated that Chase Bank would provide West with the NPV input values if she requested them within

30 days and that Chase Bank would conduct a new evaluation if West provided evidence that any of those input values were inaccurate. West could justifiably rely on those representations, and she alleged she asked for those input values on April 8 and on May 24, 2010. Chase Bank never sent them to her before foreclosing.

West also alleged that from the time of the Trial Plan Agreement, Chase Bank concealed the fact it was pursuing foreclosure and that on May 24, a Chase Bank representative told West that no trustee's sale was scheduled. West could have justifiably relied on that representation too, particularly considering she was requesting a reevaluation of Chase Bank's decision to deny her a permanent loan modification.

## C. *Causation*

Chase Bank argues West has not pleaded, and cannot plead, her reliance on the alleged misrepresentations caused her to suffer damages; that is, she did not " 'establish a complete causal relationship' between the alleged misrepresentations and the harm claimed to have resulted therefrom." (See *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1092 [23 Cal.Rptr.2d 101, 858 P.2d 568].)

West alleged that in reliance on the representations and Chase Bank's alleged concealment of the foreclosure sale, she suffered damages "including loss of mortgage payments made under false pretenses, attorney fees, legal costs, personal injuries, pain and suffering, anxiety, humiliation, fear, extreme emotional distress, and physical injuries." As Chase Bank argues, West already owed the mortgage payments and was obligated to make them notwithstanding the alleged misrepresentations. West also alleged, however, that Chase Bank "lull[ed]" her into "a false sense of security, so she would not hire an attorney to protect her rights," and then pursued the foreclosure sale despite telling her, on May 24, 2010, that no foreclosure sale had been scheduled.

The third amended complaint, read as a whole, may be reasonably construed to allege that West's reliance on Chase Bank's alleged misrepresentations caused West to forego taking legal action to stop the foreclosure sale. Under the allegations of the third amended complaint, West likely would have been successful in taking legal action to stop the sale. In the April 5, 2010 letter denying a loan modification, Chase Bank offered to conduct a new NPV evaluation if West made a timely request for input values and provided evidence those values were inaccurate. West alleged she timely requested the input values, but Chase Bank never provided her the information. In January 2010 and again in March 2010, Chase Bank advised West to "continue to make your trial period payments on time." She made all of her payments.

## II.

## Breach of Written Contract Cause of Action

In the seventh cause of action for breach of written contract, West alleged the Trial Plan Agreement constituted a written contract, which Chase Bank breached by denying her a permanent loan modification after "secretly" selling her home. We conclude the third amended complaint stated a cause of action for breach of written contract.

Chase Bank does not dispute the Trial Plan Agreement constituted a written contract. Many federal courts have concluded a trial loan modification under HAMP constitutes a valid, enforceable contract under state law, at least at the pleading stage of litigation. (E.g., *Wigod, supra,* 673 F.3d at pp. 560–561 [valid contract under Illinois law]; *Gaudin v. Saxon Mortgage Services, Inc.* (N.D.Cal. 2011) 820 F.Supp.2d 1051, 1053–1054 [valid contract]; *Bosque v. Wells Fargo Bank, N.A., supra,* 762 F.Supp.2d at pp. 352–353 [valid contract under Massachusetts law]; *Sutcliffe v. Wells Fargo Bank, N.A.* (N.D.Cal. 2012) 283 F.R.D. 533, 550 [valid contract under California law]; *Turbeville v. JPMorgan Chase Bank* (C.D.Cal., Apr. 4, 2011, No. SA CV 10-01464 DOC (JCGx)) 2011 U.S.Dist. Lexis 42290, pp. *8–*12 [valid contract under California law].) Chase Bank does not argue lack of offer and acceptance, consideration, certain terms, or any element necessary to create an enforceable contract.

Instead, Chase Bank argues it did not as a matter of law breach the terms of the Trial Plan Agreement because the exhibits to the third amended complaint establish that Chase Bank did reevaluate West's application for a permanent loan modification. Chase Bank relies on the term of the Trial Plan Agreement, which stated, "[i]f all payments are made as scheduled, we will reevaluate your application for assistance and determine if we are able to offer you a permanent workout solution to bring your loan current." Attached to the third amended complaint was Chase Bank's letter, dated April 5, 2010, notifying West that Chase Bank had determined she did not qualify for a loan modification based on a calculation of her NPV under a formula developed by the Department of the Treasury.

■ This argument ignores Chase Bank's obligations under HAMP and the express and implied obligations under the Trial Plan Agreement. When Chase Bank received public tax dollars under the Troubled Asset Relief Program,[3] it agreed to offer TPP's and loan modifications under HAMP

---

[3] The Emergency Economic Stabilization Act of 2008, title 12 United States Code section 5201 et seq., gave the Secretary of the Treasury the power to establish the Troubled Asset Relief Program to purchase, make, and fund commitments to purchase troubled assets from any financial institution, on such terms and conditions as set by the secretary. (12 U.S.C.

according to guidelines, procedures, instructions, and directives issued by the Department of the Treasury. (*Wigod, supra*, 673 F.3d at p. 556.) Under the United States Department of the Treasury, HAMP supplemental directive 09-01 (Apr. 6, 2009) (Directive 09-01), if the lender approves a TPP, and the borrower complies with all the terms of the TPP and all of the borrower's representations remain true and correct, the lender *must offer* a permanent loan modification. (*Wigod, supra*, at p. 557.) Directive 09-01, *supra*, at page 18, states: "If the borrower complies with the terms and conditions of the [TPP], the loan modification will become effective on the first day of the month following the trial period . . . ."[4]

In *Wigod, supra*, 673 F.3d at page 558, the defendant bank issued the plaintiff a four-month TPP. The TPP stated that if the plaintiff was in compliance with the plan and her representation on which the plan was issued continued to be true, then the defendant " 'will provide me with a [permanent] Loan Modification Agreement.' " (*Ibid.*) The plaintiff alleged she made all the payments required under the TPP, but the defendant bank improperly reevaluated her eligibility and declined to offer her a permanent loan modification. (*Ibid.*) The Seventh Circuit Court of Appeals concluded the plaintiff adequately pleaded causes of action under Illinois law for breach of contract, promissory estoppel, and fraudulent misrepresentations against the defendant bank. (*Id.* at p. 559.) The court held the TPP constituted a valid and enforceable contract under Illinois law and the defendant bank breached the express terms of the contract by declining to offer the plaintiff a permanent loan modification. (*Id.* at pp. 561–566.) Under HAMP guidelines, the defendant bank had "some limited discretion to set the precise terms of an offered permanent modification" if "[the plaintiff] fulfilled the TPP's conditions." (*Wigod, supra*, at p. 565.) Nonetheless, the defendant bank was required to offer "*some* sort of good-faith permanent modification to [the plaintiff] consistent with HAMP guidelines." (*Ibid.*)

Unlike the TPP in *Wigod*, the Trial Plan Agreement signed by West, and prepared by Chase Bank, did not expressly include the proviso that Chase Bank would offer a permanent loan modification if she complied with that agreement's terms. But such a proviso is imposed by the United States Department of the Treasury through Directive 09-01, *supra*, page 18 (see *Wigod, supra*, 673 F.3d at p. 557), and a contract must be interpreted in a way to make it lawful (Civ. Code, § 1643). To make the Trial Plan Agreement lawful, it must be interpreted to include the proviso imposed by Directive

§ 5211(a)(1).) The Emergency Economic Stabilization Act of 2008 defines a "troubled asset" as a financial instrument the purchase of which is necessary to promote financial stability. (12 U.S.C. § 5202(9)(B).)

[4] Construction of the United States Department of the Treasury directives is a question of law for the court to decide. (*Wigod, supra*, 673 F.3d at p. 580.)

09-01. In addition, HAMP guidelines "informed the reasonable expectations of the parties to [the Trial Plan Agreement]." (*Wigod, supra,* at p. 565.)

Thus, in light of Directive 09-01 and HAMP guidelines, the reasonable interpretation of the Trial Plan Agreement—and the one necessary to make it lawful and in compliance with HAMP—is that Chase Bank's reevaluation upon completion of the trial period would be limited to determining whether West had complied with the terms of the Trial Plan Agreement and whether West's original representations remained true and correct. Applying *Wigod* to this case, "[a]lthough [Chase Bank] may have had some limited discretion to set the precise terms of an offered permanent modification, it was certainly required to offer *some* sort of good-faith permanent modification to [West] consistent with HAMP guidelines. It has offered none." (*Wigod, supra,* 673 F.3d at p. 565.)

■ In addition, Chase Bank stated in its April 5, 2010 letter that, upon timely request from West, it would provide her with the input values used to calculate her NPV and, if within 30 days of receiving that information, West provided Chase Bank with evidence that any of the input values were inaccurate, and those inaccuracies were material, Chase Bank would conduct a new NPV evaluation. As a matter of contract law, the import of this letter is twofold. First, under Chase Bank's interpretation of the Trial Plan Agreement, the April 5, 2010 letter constituted a modification of that agreement. A modification of a contract is a change in the obligations of a party by a subsequent mutual agreement of the parties. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 964, p. 1055.) ■ A contract in writing may be modified by a contract in writing. (Civ. Code, § 1698, subd. (a).) Though not signed by anyone at Chase Bank, the April 5, 2010 letter bears the Chase Bank letterhead, which suffices as a signature. (Rest.2d Contracts, § 134.)

■ Second, to the extent the Trial Plan Agreement is ambiguous, the April 5, 2010 letter is relevant under the practical construction doctrine in determining Chase Bank's intent. " '[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. [Citation.] The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention.' " (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 921 [74 Cal.Rptr.3d 733].) The April 5, 2010 letter, which was drafted before a controversy arose over the Trial Plan Agreement, shows that Chase Bank intended, at the very least, to give West

the option and ability—before any foreclosure sale—to challenge the decision to deny her a permanent loan modification.

 Thus, as alleged in the third amended complaint, the Trial Plan Agreement required Chase Bank to offer West a permanent loan modification because she had complied with the terms of that agreement. In addition, West alleged she was entitled to challenge Chase Bank's decision to deny her a permanent loan modification by providing information to support a different NPV calculation. She is correct. The third amended complaint alleged Chase Bank breached the Trial Plan Agreement in these two ways, and therefore stated a cause of action for breach of written contract.

## III.

### Conversion and Slander of Title Causes of Action

 The third cause of action of the third amended complaint was for conversion, and the sixth cause of action was for slander of title. In her opening brief, West does not offer any argument or authority in support of those causes of action, a point stressed by Chase Bank in the respondent's brief. In the reply brief, West argues the third amended complaint stated causes of action for conversion and slander of title. We deem the arguments made for the first time in the reply brief to be waived. (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 427–428 [115 Cal.Rptr.3d 707]; *Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 349–350 [86 Cal.Rptr.3d 383]; *Cold Creek Compost, Inc. v. State Farm Fire & Casualty Co.* (2007) 156 Cal.App.4th 1469, 1486 [68 Cal.Rptr.3d 216] ["Arguments cannot properly be raised for the first time in an appellant's reply brief, and accordingly we deem them waived in this instance."].)

## IV.

### Set Aside or Vacate Void Trustee Sale Cause of Action

In the fourth cause of action, West alleged Chase Bank failed to comply with statutory foreclosure procedures and, on that basis, she sought to set aside or vacate the trustee's sale as wrongful.[5] We conclude the fourth cause of action did not state a claim.

---

[5] Chase Bank argues West waived her challenge to the dismissal of the fourth cause of action by not addressing it in her opening brief. That is not correct. West addressed the fourth cause of action at pages 31 through 40 of her opening brief and argued she "adequately alleged a claim for wrongful foreclosure."

 "After a nonjudicial foreclosure sale has been completed, the traditional method by which the sale is challenged is a suit in equity to set aside the trustee's sale. [Citation.] Generally, a challenge to the validity of a trustee's sale is an attempt to have the sale set aside and to have the title restored." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 103 [134 Cal.Rptr.3d 622].) The elements of a cause of action to set aside a foreclosure sale are (1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale suffered prejudice or harm; and (3) the trustor or mortgagor tenders the amount of the secured indebtedness or was excused from tendering. (*Id.* at p. 104.)

The first element may be satisfied by allegations that (1) the trustee or beneficiary failed to comply with the statutory procedural requirements for the notice or conduct of the sale; (2) the trustee did not have the power to foreclose; (3) the trustor was not in default, no breach had occurred, or the lender waived the breach; or (4) the deed of trust was void. (*Lona v. Citibank, N.A., supra*, 202 Cal.App.4th at pp. 104–105.)

In the fourth cause of action, West alleged the trustee's sale was void under either of two theories: (1) QLSC, which issued the notice of default and notice of trustee's sale, and conducted the nonjudicial foreclosure sale, did not have authority to act as trustee under the deed of trust or (2) "[d]efendants failed to give plaintiff[] notice of the foreclosure sale and the actual foreclosure date" (underscoring omitted).[6] In her opening brief, West asserts several other procedural irregularities not alleged in the third amended complaint. She argues Chase Bank failed to comply with Civil Code section 2923.5 by recording the notice of default before the mandatory 30-day wait period, the notice of default does not state the correct amount due under the note and deed of trust, and Chase Bank failed to mail her a copy of the recorded notice of default in the manner required by Civil Code section 2924b, subdivision (c)(1).

We consider only those theories presented in the third amended complaint in determining whether the trial court erred by sustaining without leave to amend Chase Bank's demurrer to the fourth cause of action. West had several opportunities to amend her complaint in the trial court and on appeal has not asked for leave to amend.

---

[6] West also alleged she was entitled to an injunction to stay the trustee's sale due to Chase Bank's violations of Civil Code section 2923.5. The trustee's sale had been conducted when the third amended complaint was filed. West's claim for injunctive relief therefore was moot from the outset.

▮ The first theory asserted in the third amended complaint is incorrect based on documents which may be judicially noticed. In support of its demurrer to the third amended complaint, Chase Bank requested the trial court take judicial notice of several documents and instruments, including (1) the notice of default and election to sell, recorded on March 18, 2009, and (2) the substitution of trustee, recorded on April 30, 2009. If a substitution of trustee is effected after recordation of a notice of default but before recordation of the notice of sale, the beneficiary or its agent must cause a copy of the substitution to be mailed to all persons to whom a notice of default is required to be mailed under Civil Code section 2924b. (Civ. Code, § 2934a, subd. (c).) "Once recorded, the substitution shall constitute conclusive evidence of the authority of the substituted trustee or his or her agents to act pursuant to this section." (*Id.*, § 2934a, subd. (d).) Here, the substitution of trustee was recorded and therefore constitutes conclusive evidence that QLSC had authority to conduct the trustee's sale.

▮ West also contends the notice of default was void because it was signed by QLSC and recorded before it became trustee. A notice of default may be filed for record by the beneficiary, trustee, or their authorized agents. (Civ. Code, § 2924, subd. (a)(1).) The notice of default in this case was signed and filed for record by QLSC "as agent for beneficiary" (capitalization omitted).

The second theory alleged in the third amended complaint was that "[d]efendants failed to give plaintiff[] notice of the foreclosure sale and the actual foreclosure date" (underscoring omitted). No details supporting this theory were alleged in the body of the third amended complaint. Attached to that complaint as exhibit No. 2 is a notice of trustee's sale, recorded on June 24, 2009, stating the sale would be conducted on July 13, 2009, at 12:00 p.m. The trustee's deed upon sale, attached as exhibit No. 3 to the third amended complaint, recites that the sale was conducted on May 26, 2010. A reasonable implication is that West is alleging Chase Bank failed to comply with the notice requirements of Civil Code section 2924g, subdivision (d) for postponing a trustee's sale.[7]

▮ An allegation of tender of the indebtedness is necessary when the person seeking to set aside the foreclosure sale asserts the sale is voidable due to irregularities in the sale notice or procedure. (*Lona v. Citibank, N.A., supra*, 202 Cal.App.4th at p. 112; *Abdallah v. United Savings Bank* (1996) 43

---

[7] Civil Code section 2924g, subdivision (d) reads, in relevant part: "The notice of each postponement and the reason therefor shall be given by public declaration by the trustee at the time and place last appointed for sale. A public declaration of postponement shall also set forth the new date, time, and place of sale and the place of sale shall be the same place as originally fixed by the trustee for the sale. No other notice of postponement need be given."

Cal.App.4th 1101, 1109 [51 Cal.Rptr.2d 286].) " 'The rationale behind the rule is that if [the borrower] could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the [borrower].' " (*Lona v. Citibank, N.A., supra,* at p. 112.)

West did not allege she tendered or could tender the full amount of the indebtedness. She argues instead an allegation of tender was not required: "While a tender may be required when a plaintiff alleges a procedural irregularity, West alleges the theory that the process, sale and trustee[']s deed upon sale w[ere] void for failure to comply with California statutory law [citation]. Under these facts, an offer, or tender to pay the debt, is <u>not required</u>, (where it would be inequitable), such as where plaintiffs <u>have a legal right to avoid the sale</u> [citation]."

The third amended complaint alleged only procedural irregularities in the sale notice and procedure. The trustee's deed upon sale recites that the trustee complied with the deed of trust and all applicable statutory requirements of the State of California. No inconsistent recitals appear on the face of the trustee's deed. Thus, any notice defects are deemed voidable, not void. (*Dimock v. Emerald Properties* (2000) 81 Cal.App.4th 868, 877 [97 Cal.Rptr.2d 255].) West therefore was required to allege tender of the indebtedness to seek to set aside the trustee's sale. The trial court did not err by sustaining without leave to amend the demurrer to the fourth cause of action.

## V.

## Quiet Title Cause of Action

In the 10th cause of action, West sought to quiet title against Chase Bank, Washington Mutual, and QLSC on the ground Chase Bank failed to comply strictly with the statutory nonjudicial foreclosure procedures. Chase Bank argues the quiet title cause of action is defective for several reasons, among which is that Chase Bank no longer holds title to the property. This argument has merit.

■■■ An element of a cause of action for quiet title is "[t]he adverse claims to the title of the plaintiff against which a determination is sought." (Code Civ. Proc., § 761.020, subd. (c).) West did not satisfy this element because none of the defendants to the third amended complaint has adverse claims to title. In support of the demurrer to the third amended complaint,

Chase Bank requested the trial court take judicial notice of the recorded trustee's deed upon sale issued to Green Island Holdings, LP, as grantee. A court may take judicial notice of a recorded deed. (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 194 [147 Cal.Rptr.3d 41].) The trustee's deed upon sale includes a recitation that "[t]he grantee herein WASN'T the foreclosing beneficiary." (Original capitalization.)

Thus, based on the third amended complaint and the documents judicially noticed, none of the defendants named in the third amended complaint had adverse claims to title. West did not name Green Island Holdings, LP, or any subsequent purchasers as a defendant in the third amended complaint. Accordingly, the trial court did not err by sustaining without leave to amend the demurrer to West's quiet title cause of action. Nothing we say precludes West from seeking leave to amend to allege quiet title based on other facts or theories.

## VI.

### Promissory Estoppel Cause of Action

In the cause of action for promissory estoppel, West alleged Chase Bank made various promises to induce her to enter into the Trial Plan Agreement. Chase Bank argues the promissory estoppel cause of action is defective because West failed to allege the promises with clarity and specificity and failed to allege detrimental reliance.

The elements of promissory estoppel are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person, (3) the promise induces action or forbearance by the promisee or a third person (which we refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63]; see Rest.2d Contracts, § 90, subd. (1).)

" '[A] promise is an indispensable element of the doctrine of promissory estoppel. The cases are uniform in holding that this doctrine cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaining party relied to his prejudice . . . .' [Citation.] The promise must, in addition, be 'clear and unambiguous in its terms.' [Citation.]" (*Garcia v. World Savings, FSB* (2010)

183 Cal.App.4th 1031, 1044 [107 Cal.Rptr.3d 683].) For a promise to be enforceable, it need only be " 'definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.' [Citations.]" (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 209 [45 Cal.Rptr.3d 692].)

In the promissory estoppel cause of action, West alleged: "Defendant made clear, definite and certain promises to Plaintiff to induce her to enter into oral executed and written HAMP agreements, including promises not to sell during the HAMP reevaluation, that there was no foreclosure date pending, that it would send Plaintiff the NPV input data, that Plaintiff would have 60 days to obtain a reevaluation for a HAMP permanent modification, all of which were false causing Plaintiff to forbear from taking legal action against it, to relinquish mortgage payments (under false pretenses), and incur damages and personal injuries."

Read in isolation, this allegation did not clearly and specifically allege a promise made by Chase Bank. But we do not read passages from a complaint in isolation; in reviewing a ruling on a demurrer, we read the complaint "as a whole and its parts in their context." (*City of Dinuba v. County of Tulare, supra,* 41 Cal.4th at p. 865.) Read as a whole, the third amended complaint clearly and specifically alleged these promises meeting the requirements for promissory estoppel: (1) in the Trial Plan Agreement, Chase Bank promised West that it had offered her a trial loan modification under the HAMP guidelines and, during the trial modification period, Chase Bank would not pursue foreclosure; (2) the April 5, 2010 letter promised West that Chase Bank would reevaluate the denial of a permanent loan modification if she timely submitted evidence the NPV input values used by Chase Bank were inaccurate; (3) on May 24, 2010, a Chase Bank representative promised West she could resubmit her updated financial data for reevaluation for HAMP modification; and (4) on the same day, the Chase Bank representative promised West there was no foreclosure sale date or sale scheduled. The promises alleged are " 'definite enough' " for us to determine " 'the scope of the duty' " imposed by them. (*Bustamante v. Intuit, Inc., supra,* 141 Cal.App.4th at p. 209.)

On the requirement of detrimental reliance, the promissory estoppel cause of action itself alleged: "Plaintiff relied upon such promises to her detriment. Plaintiff's reliance was justified and reasonable. Plaintiff has been injured by such reliance." Read in isolation, this allegation is insufficient. But the third amended complaint, read as a whole, may be reasonably interpreted to allege that West's reliance on Chase Bank's alleged misrepresentations caused West not to take legal action to stop the trustee's sale. In her opening brief, West

also claims that, if she had known Chase Bank would not offer her a permanent loan modification, "she would have pursued other options, including possibly selling her home, retaining counsel earlier, and/or finding a co-signer to save her home."

In *Wigod*, the Seventh Circuit Court of Appeals held the plaintiff's cause of action for promissory estoppel alleged a "sufficiently clear promise" and detrimental reliance: "[The plaintiff] asserts that Wells Fargo made an unambiguous promise that if she made timely payments and accurate representations during the trial period, she would receive an offer for a permanent loan modification calculated using the required HAMP methodology." (*Wigod, supra*, 673 F.3d at p. 566.) The court concluded the plaintiff relied on that promise to her detriment by foregoing the opportunity to use other remedies to save her home and by devoting her resources to making the lower monthly payments under the TPP rather than attempting to sell her home or defaulting. (*Ibid.*) In *Turbeville v. JPMorgan Chase Bank, supra*, 2011 U.S.Dist. Lexis 42290 at pages *17–*18, the plaintiffs alleged that in reliance on the defendant bank's promise, they made the trial plan payments rather than pursue other opportunities to cure the default. The court concluded that allegation was sufficient for detrimental reliance. (*Id.* at p. *18.) West's third amended complaint adequately alleges promissory estoppel under these authorities.

## VII.

## Unfair Competition Cause of Action

In the fifth cause of action, West alleged violations of the California unfair competition law (UCL), Business and Professions Code section 17200 et seq. She alleged: "In furtherance of Defendants' common plan and scheme, as alleged, including but not limited to obtaining mortgage payment money by false pretenses, false representations regarding HAMP modification re-evaluation acts, deadlines and other promises, and concealing the true trustee . . . in its notices, s[ale] and trustee's deed upon sale, Defendants, and each of them, committed an unlawful, unfair, deceptive or fraudulent business practice."

The UCL permits civil recovery for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200.) " 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. . . .' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].)

██ By defining "unfair competition" to include any unlawful act or practice, the UCL permits violations of other laws to be treated as independently actionable as unfair competition. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra*, 20 Cal.4th at p. 180.) Several definitions of "unfair" under the UCL have been formulated. They are:

1. "An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 839 [51 Cal.Rptr.3d 118].)

2. " '[A]n "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]' [Citation.]" (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 719 [113 Cal.Rptr.2d 399].)

3. An unfair business practice means " 'the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.' " (*Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940 [134 Cal.Rptr.2d 101].)

██ A fraudulent practice under the UCL "require[s] only a showing that members of the public are likely to be deceived" and "can be shown even without allegations of actual deception, reasonable reliance and damage." (*Daugherty v. American Honda Motor Co., Inc., supra*, 144 Cal.App.4th at p. 838.)

We conclude the third amended complaint stated a cause of action under the UCL based on unfair or fraudulent practices. Liberally construed, the third amended complaint alleged Chase Bank engaged in a practice of making TPP's that did not comply with HAMP guidelines and the United States Department of the Treasury directives; made misrepresentations regarding a borrower's right and ability to challenge the bank's calculation of the NPV; made misrepresentations about pending foreclosure sales; and wrongfully had trustee's sales conducted when the borrower was in compliance with a TPP. Under such allegations, Chase Bank engaged in unfair business practices under any of the three definitions. Chase Bank concedes that West's cause of action under the UCL "depends on the viability of the underlying claims," and the claims for fraud, negligent misrepresentation, breach of written contract, and promissory estoppel are viable.

## Disposition

The judgment is affirmed as to the causes of action for conversion, to set aside or vacate void trustee sale, for slander of title, and to quiet title. In all other respects, the judgment is reversed and the matter remanded for further proceedings. West shall recover costs incurred on appeal.

O'Leary, P. J., and Moore, J., concurred.

A petition for a rehearing was denied April 11, 2013, and respondent's petition for review by the Supreme Court was denied July 10, 2013, S210257. Kennard, J., did not participate therein.