Filed 8/21/13; pub. order 9/17/13 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HENRY ASPIRAS et al., | D061449 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2010-00088855-CU-BT-CTL) |
| WELLS FARGO BANK, N.A., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lisa A. Foster, Judge. Affirmed.

Haskins & Associates, Steven W. Haskins, Margaret A. Pitchkolan and Jesse T. Farris, for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Edward D. Vogel, Karin D. Vogel and Mark G. Rackers, for Defendant and Respondent.

Plaintiffs and appellants Henry Aspiras and Gloria Aspiras appeal from a judgment entered after the trial court dismissed with prejudice their second amended complaint for fraud, negligent misrepresentation and violation of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200, et seq.) against defendant and respondent Wells

Fargo Bank, N.A. (Wells Fargo). The court dismissed the case after plaintiffs declined to amend their pleading following the sustaining of Wells Fargo's demurrer with leave to amend. Plaintiffs contend the court erred by failing to accept the second amended complaint's allegations as true, including as to Wells Fargo's ratification of alleged misrepresentations made by an employee concerning plaintiffs' mortgage loan and loan modification status. They further contend the court should have overruled Wells Fargo's demurrer because they pleaded fraud and negligent misrepresentation with the requisite specificity. At this court's request, the parties briefed the application, if any, of *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 (*Jolley*). Having considered the parties' arguments, we distinguish *Jolley* and decline to apply its dicta concerning the duties of care of a conventional lender. We reject plaintiffs' other contentions, and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are taken from plaintiffs' second amended complaint; we accept as true the properly pleaded material allegations and facts that may properly be judicially noticed. (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 806; *Debrunner v. Deutsche Bank National Trust Co.* (2012) 204 Cal.App.4th 433, 435.)[1]

---

[1] At Wells Fargo's request, the trial court judicially noticed various documents including plaintiffs' deed of trust recorded in April 2008, a notice of default recorded in January 2009, a notice of trustee's sale recorded in April 2009, and the trustee's deed upon sale recorded in April 2010.

2

Plaintiffs financed the purchase of their San Diego residence with a promissory note for $625,300 and deed of trust, which was recorded in December 2004.  In April 2008, plaintiffs refinanced the home with Wachovia Mortgage FSB (Wachovia), and in October 2008, began loan modification negotiations with Wachovia.  In January 2009, the trustee recorded a notice of default and election to sell under the deed of trust; the notice states plaintiffs were $11,144.27 in arrears as of January 20, 2009.  Wachovia transferred the loan to Wells Fargo in October 2009, and plaintiffs resumed loan modification negotiations with it.

On or about February 5, 2010, Wells Fargo sent plaintiffs a letter informing them that preliminary review indicated they may not be eligible for the Home Affordable Modification Program (HAMP),[2] but it had been directed to place their mortgage in a "Trial Period Plan" until March 7, 2010, and that they should contact Wells Fargo no later than that date if they disagreed with its preliminary decision concerning HAMP eligibility.  During the remainder of the month, plaintiffs spoke with various Wells Fargo

_____

[2]    "As authorized by Congress, the United States Department of the Treasury implemented the . . . HAMP to help homeowners avoid foreclosure during the housing market crisis of 2008.  'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' "  (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 785.)  Treasury guidelines set forth threshold criteria to define the class of eligible borrowers, and those guidelines set forth accounting steps using a standardized net present value test to determine whether it is more profitable to modify the loan or to allow it to proceed to foreclosure.  (*Nungaray v. Litton Loan Servicing, LP* (2011) 200 Cal.App.4th 1499, 1502.)  "Calculations under HAMP involve assigning values to certain variables that are largely within the servicers' discretion, thus precluding any entitlement to loan modifications."  (*Ibid.*)

representatives and at Wells Fargo's request, submitted financial documents to Wells Fargo in early March. On March 9, 2010, Wells Fargo informed plaintiffs by letter it would not adjust the terms of their mortgage.

On March 11, 2010, Gloria Aspiras called Wells Fargo in order to reopen the modification process and spoke with a person in its customer service department who identified himself or herself as a Wells Fargo employee. During that call, the employee told Ms. Aspiras that her loan had been transferred to the foreclosure department, there was no scheduled trustee's sale date, and the modification would be reopened if plaintiffs submitted documents showing additional income. At some point later, Ms. Aspiras was told she had been preapproved for a loan modification but would need to submit another package and that a loan negotiator would be calling her shortly. As a result of that conversation, she submitted another loan modification package.

On March 15, 2010, Wells Fargo representative Shannon Gordon, who was with Wells Fargo's "home preservation" team, contacted plaintiffs regarding loan modification negotiations. Plaintiffs explained to Gordon that Wells Fargo's February 5, 2010 letter contained inaccurate information concerning their income; that they had more income than what was represented. At Gordon's direction, plaintiffs submitted additional documents needed to process their request, and they did so on March 18, and March 24, 2010. On March 18, 2010, Gordon told plaintiffs their loan modification was "under review." The next day, however, Wells Fargo sold plaintiffs' home at a trustee's sale to third party investors. A trustee's deed upon sale was recorded on April 1, 2010. The

4

investors sold the home about six weeks later for almost $200,000 more than the purchase price.

On or about March 21, 2010, plaintiffs spoke again with Gordon, who informed them their home had been sold at the trustee's sale two days earlier. Plaintiffs had never received prior notice that Wells Fargo would be selling the home, and told Gordon, who responded that some notice should have been sent. Gordon told Ms. Aspiras to fax a letter to the bank stating he was engaged in modification efforts with them.

On or about March 24, 2010, Wells Fargo sent plaintiffs a letter offering them a special forbearance agreement that they could accept by signing and returning the letter with the first of several specified installment payments. That agreement required plaintiffs to make installment payments during a trial period, after which their loan would not be "contractually current," but Wells Fargo would review their remaining outstanding payments and fees for a loan modification. The agreement further stated: "If your loan is in foreclosure, we will instruct our foreclosure counsel to suspend foreclosure proceedings once the initial installment has been received, and to continue to suspend the action as long as you keep to the terms of the Agreement. Upon full reinstatement, we will instruct our foreclosure counsel to dismiss foreclosure proceedings and report to the credit bureaus accordingly." Plaintiffs were unable to comply with the terms of the forbearance agreement because their home had already been sold. On March 24, and March 26, 2010, Gordon continued to tell plaintiffs that their loan modification was under review.

5

At the time their home was sold at the trustee's sale, plaintiffs had enough cash in the bank to pay the principal balance of the loan or alternatively to pay all amounts owing to keep their home from being foreclosed, and they intended to make such a payment if Wells Fargo did not modify their loan.

*Plaintiffs' Lawsuit and Amendments of their Complaint*

Ten days after the trustee's sale, plaintiffs sued Wells Fargo for fraud, negligent misrepresentation and "unlawful business practices" under the UCL.  Wells Fargo generally and specially demurred and the court overruled its special demurrer but sustained its general demurrers with leave to amend, ruling Gordon's statements were opinion and did not constitute actionable fraud, and the February 5, 2010 letter informed plaintiffs they did not receive a modification.  Plaintiffs then filed a first amended complaint, to which Wells Fargo again demurred on grounds it failed to state facts sufficient to constitute a cause of action.  Wells Fargo asserted plaintiffs in fact received written notice of the trustee's sale, which was to take place on May 12, 2009, and it asked the court to take judicial notice of that document, which was recorded on April 23, 2009. It reiterated its arguments that Gordon's alleged statements were merely opinion, and that plaintiffs did not allege other elements of fraud.  The court overruled the demurrer, and Wells Fargo answered plaintiffs' first amended complaint.

Wells Fargo thereafter moved for summary judgment or alternatively summary adjudication of issues.  In connection with that motion, it submitted portions of Gloria Aspiras's deposition in which she acknowledged she and her husband stopped making

6

mortgage payments in order to obtain a loan modification, and she understood the loan was in default. She admitted receiving a letter from Wells Fargo informing her that if the loan was not cured, the home was subject to a foreclosure sale. She also admitted receiving the April 23, 2009, notice of trustee's sale. Gloria Aspiras, a real estate agent, testified she understood what the latter notice meant, but that the May 12, 2009 sale was postponed while she pursued her loan modification.

After Wells Fargo filed its summary judgment motion, plaintiffs moved for leave to amend the first amended complaint. Specifically, plaintiffs sought to include the allegation that "[Gloria Aspiras] called a Wells Fargo agent and representative on March 11, 2010, who told her the loan had recently been transferred from the modification department to the foreclosure department and that there was no trustee sale pending." Plaintiffs maintained the unidentified representative's statement was reflected in Gloria Aspiras's deposition, which contained a typographical error on the page where she recounted the conversation; according to them, Gloria Aspiras had testified that on March 11, 2010, the representative told her "there's no [auction date] yet" but due to Aspiras's thick accent the reporter transcribed the words, "option there" instead of "auction date."

The court granted plaintiffs leave to amend and they filed their second amended complaint. That pleading added the following allegations: "On March 11, 2010, Plaintiff called the number from the March 9, 2010 Wells Fargo letter titled 'Decision on your request for Mortgage Assistance' and spoke with an individual in the Customer Service department who identified themselves as a Wells Fargo employee. Plaintiff made the call

7

to re-open the modification process based on additional income that had not been taken into consideration. During that telephone call, the Wells Fargo Employee told Ms. Aspiras that: [¶] • her loan had been transferred to the foreclosure department; [¶] • there was no trustee's sale date scheduled for the Property; [¶] • if Plaintiff submitted additional documents showing additional income that the modification would be re-opened. [¶] Thereafter Gloria Aspiras was told that she had been pre-approved for a loan modification; that she needed to submit another loan modification package and that a loan 'negotiator' would be contacting her shortly. As a result of the conversation, Gloria Aspiras submitted another loan modification package shortly thereafter." Plaintiffs alleged those representations were false, and "[t]he true facts were that the trustee's sale date for the Property had been scheduled to take place on March 19, 2010 and that regardless of whether or not Plaintiff submitted additional financial documents, the modification process would not be re-opened and the trustee's sale would proceed as scheduled on March 19, 2010." Plaintiffs further alleged that Wells Fargo "had no intention of providing Plaintiffs verbal or written notice regarding the date that the trustee's sale of Plaintiffs [*sic*] house would take place"; they were ignorant of the falsity of the representations, and in reliance on them, they were induced not to take any other action to reinstate their loan or to forestall the foreclosure and protect the substantial amount of equity they had in the property. They alleged they were induced to provide the various loan modification packages, and as a result of their inaction the property was foreclosed upon and sold at the trustee's sale, causing them damage.

8

Wells Fargo again demurred, which the trial court sustained with 10-days leave to amend, ruling plaintiffs had not alleged fraud with the requisite specificity. The court explained: "[P]laintiffs fail to plead what misrepresentation . . . Wells Fargo made to plaintiff and how . . . Wells Fargo misstated anything (other than a misrepresentation on March 11, 2010[,] by an unidentified employee who did not work in the foreclosure department); plaintiffs fail to allege . . . Wells Fargo ratified or authorized the March 11, 2010 statement by the unnamed employee; and plaintiffs fail to allege how . . . Wells Fargo ratified or authorized the March 11, 2010 statement." The court further ruled plaintiffs did not plead facts to establish the elements of intent to induce reliance, justifiable reliance, causation or damages. Finally, the court ruled plaintiffs did not plead facts to support liability under the UCL.

Plaintiffs did not timely amend, and the trial court dismissed the second amended complaint with prejudice. (Code Civ. Proc., § 581, subd. (f)(2).) Thereafter, the court entered a judgment of dismissal in Wells Fargo's favor. Plaintiffs appeal.

DISCUSSION

I. *Standard of Review*

When reviewing a judgment dismissing a complaint after the court sustains a demurrer, the reviewing court must assume the truth of the complaint's properly pleaded or implied factual allegations, and also consider judicially noticeable matters. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) We read the complaint in context

9

and give it a reasonable interpretation.  (*Ibid*.)

We review de novo whether the complaint alleges facts sufficient to state a cause of action.  (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10; *CPF Agency Corp. v. Sevel's 24 Hour Towing Service* (2005) 132 Cal.App.4th 1034, 1042.) "If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer.  '[W]e are not limited to plaintiffs' theory of recovery . . . .' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 (*Quelimane*).)  " 'A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground.' " (*Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1153.)

## II.  *Sham Amendment*

Preliminarily, we dispose of Wells Fargo's contention that plaintiffs' amendment to their second amended complaint should be disregarded as sham.  The sham pleading doctrine is implicated when a party seeks to amend its pleading to omit harmful allegations without explanation.  (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425; *Hendy v. Losse* (1991) 54 Cal.3d 723, 742-743.)  It may also apply where a party "add[s] facts inconsistent with those of previous pleadings. . . ." (*Deveny*, at p. 425, quoting *Colapinto v. County of Riverside* (1991) 230 Cal.App.3d 147, 151; see *Lockton v. O'Rourke* (2010) 184 Cal.App.4th 1051, 1060-1061.)  In cases of such amendments, the

10

court may take judicial notice of prior pleadings and disregard any inconsistent allegations. (*Deveny*, at p. 425; *Lockton*, at p. 1061.)

Plaintiffs' first amended complaint read: "On March 11, 2010 Plaintiffs were pre-qualified over the phone with a representative from Wells Fargo for a modification and submitted another loan modification package as a result of the conversation." Plaintiffs' proposed amendment, which the trial court allowed after a contested hearing, added allegations relating the contents of that telephone conversation and facts concerning the representative and his or her department. The amendment was not an omission of harmful allegations, nor was it inconsistent with any prior allegation. (Contra, *Lockton v. O'Rourke*, *supra*, 184 Cal.App.4th at pp. 1060-1061 [trial court properly took into account prior verified iterations of complaint, which set out materially different versions of a conversation between the plaintiff and his attorney critical to a statute of limitations tolling issue].)

"The sham pleading doctrine is not ' "intended to prevent honest complainants from correcting erroneous allegations . . . or to prevent correction of ambiguous facts" ' " but is "intended to enable courts ' "to prevent an abuse of process." ' " (*Deveny v. Entropin, Inc.*, *supra*, 139 Cal.App.4th at p. 426.) In these circumstances, and given the strong policy in favor of liberal allowance of amendments (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 296), we decline to apply the sham pleading doctrine.

### III. *Cause of Action for Fraud*

To state a fraud cause of action plaintiffs must allege (1) a misrepresentation (a false representation, concealment or nondisclosure) as to a material fact; (2) knowledge

of its falsity or scienter; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. (*Robinson Helicopter Co. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.) "In California, fraud must be pled specifically; general and conclusory allegations do not suffice." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.) The heightened pleading standard for fraud requires " 'pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Ibid.*) And, " '[a] plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." ' " (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1614, quoting *Lazar*, at p. 645; *Tarmann v. State Farm Mut. Auto Inc. Co.* (1991) 2 Cal.App.4th 153, 157.) The normal policy of liberally construing pleadings against a demurrer will not be invoked to sustain a fraud cause of action that fails to set forth such specific allegations. (*Lazar*, at p. 645.)

The heightened pleading rule serves two purposes: One is "notice to the defendant, to 'furnish [it] with certain definite charges which can be intelligently met.' " (*Committee On Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216, superseded by statute on another ground as stated in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227.) The second is to weed out nonmeritorious actions based on the complaint; to " ' "enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' " (*Committee On Children's Television, Inc.*, at pp. 216-217.)

12

Exceptions exist to the particularity requirement, however. "Less specificity is required when 'it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy . . . .' " (*Committee on Children's Television, Inc. v. General Foods Corp.*, *supra*, 35 Cal.3d at p. 217; see *Quelimane*, *supra*, 19 Cal.4th at p. 47 [the pleading rule for fraud "is relaxed when it is apparent from the allegations that the defendant necessarily possesses knowledge of the facts"].) A court may relax the strict pleading standards where a plaintiff alleges many affirmative misrepresentations occurring over a period of several years in methods whose time and place are fully known to the defendant. (See *Committee On Children's Television, Inc.*, at p. 217 [dispensing with heightened pleading requirement where multiple plaintiffs alleged thousands of misrepresentations in various media, including television advertisements and cereal boxes, over a span of four years]; see also *Alfaro v. Community Housing Imp. System & Planning Ass'n, Inc.* (2009) 171 Cal.App.4th 1356, 1384-1385 [particularity requirement is not violated where 38 plaintiffs alleged fraudulent nondisclosures on the part of unnamed corporate employees concerning the existence of a deed].)

Plaintiffs' misrepresentation claims are based on the single telephone conversation occurring on March 11, 2010. That call, initiated by Gloria Aspiras to Wells Fargo's customer service department, was with an individual identifying himself or herself as a Wells Fargo employee, who purportedly told Aspiras her loan had been transferred to the foreclosure department but that no trustee's sale was scheduled, and Wells Fargo would

13

reopen her modification if she submitted documents showing additional income. Plaintiffs further allege that at some later point, they were told they were "preapproved" for a loan modification, but the complaint does not even identify that person as a Wells Fargo employee. These critical allegations are deficient; they simply lack the required specifics as to the name of the person at Wells Fargo who spoke and his or her authority to speak. (*Lazar v. Superior Court*, *supra*, 12 Cal.4th at p. 645.)

In reaching this conclusion, we distinguish those cases in which courts have found plaintiffs met their fraud pleading burden because the identity of a person or persons making the misrepresentations was a matter uniquely within the defendant's knowledge. (E.g., *West v. JPMorgan Chase Bank, N.A.*, *supra*, 214 Cal.App.4th at p. 793; *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248.) In *West*, the plaintiff specifically alleged that Chase Bank's false representations had occurred in a written agreement (sent by an identified person) and letter from the Chase Fulfillment Center, which were attached to the operative complaint, as well as during two telephone conferences. (*West*, at p. 793.) The court held the plaintiff did not have to plead the identity of the preparer of the letter because it was "uniquely within Chase Bank's knowledge." (*Ibid*.) Similarly, in *Boschma*, the plaintiff attached the documents containing the allegedly false representations—certain option adjustable rate mortgage loan documents—to their operative pleading. (*Boschma*, at pp. 235-242, 248.) Relying on federal district court authority, the *Boschma* court held attachment of the relevant documents met the heightened pleading burden: " '[P]laintiffs' evidence is the mortgage instrument, which provides the specific content of the allegedly false representations

14

related to negative amortization, as well as the date and place of the alleged fraud. While the precise identities of the employees responsible . . . are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents.' " (*Boschma*, at p. 248, quoting *Jordan v. Paul Financial, LLC* (N.D. Cal. 2010) 745 F.Supp.2d 1084, 1096.) Nor are plaintiffs' pleadings like those in *Committee On Children's Television, Inc. v. General Foods Corp.*, *supra*, 35 Cal.3d 197, involving thousands of misrepresentations in defined media, or allegations of uniform nondisclosures by corporate employees to multiple plaintiffs, as in *Alfaro v. Community Housing Imp. System & Planning Ass'n, Inc.*, *supra*, 171 Cal.App.4th at pp. 1384-1385.)

Here, unlike the above-referenced cases, plaintiffs provide no additional information allowing us to conclude that Wells Fargo will *necessarily* have superior knowledge of that person's identity or authority to speak. Under these circumstances, "we consider this exception inapplicable here, for [Wells Fargo] has no more reason to know who made the allegedly false representations to [plaintiffs] than [plaintiffs]." (*Tarmann v. State Farm Mut. Auto Ins. Co.*, *supra*, 2 Cal.App.4th 153, 158.)[3]

---

[3]    In *Tarmann v. State Farm Mut. Auto. Ins. Co.*, *supra*, the plaintiff alleged that after an accident, an unnamed claims adjustor for State Farm told her she was authorized to use a local dealership for auto repairs, but that State Farm later refused to pay for them. (*Tarmann v. State Farm Mut. Auto. Ins. Co.*, *supra*, 2 Cal.App.4th at pp. 156-157.) The plaintiff had "generally alleged that the persons were 'authorized agents of State Farm . . . cloaked with such authority' and were 'adjustors and/or claims supervisors/managers[.]' However, she specifically alleged she did not know their names." (*Id.* at pp. 157-158, fn. omitted.) The Court of Appeal declined in that instance to hold State Farm necessarily possessed full information concerning the facts, and would not relax the strict pleading requirements for fraud against a corporation in the face of those allegations, stating "State

15

Specificity is especially critical where it is alleged the customer service employee purported to make representations concerning matters within a different department at Wells Fargo, and Wells Fargo representatives provided contradictory information to plaintiffs. In effect, the allegations of statements made by unnamed employees, if they are employees, leaves Wells Fargo with no real way to dispute plaintiffs' claim of fraud. The allegations do not provide Wells Fargo with sufficient notice, or enough foundation to make out a prima facie charge of fraud. "The pleading of fraud . . . is . . . the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings." (*Committee On Children's Television*, *supra*, 35 Cal.3d at pp. 216–217.) Under these circumstances, we will not dispense with the long-held principle of law in California requiring heightened pleading for fraud. And, as these pleading requirements have been at least impliedly applied to the tort of negligent misrepresentation (see *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184), we conclude the deficient pleading defeats plaintiffs' cause of action for negligent misrepresentation.

IV. *Unfair Competition Law Cause of Action*

In order to state a claim for a violation of the UCL, plaintiffs must allege that Wells Fargo committed a business act or practice that is fraudulent, unlawful, or unfair. (See *Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 986.) A claim made under section 17200 " 'is not confined to anticompetitive business practices, but is also directed

---

Farm has no more reason to know who made the allegedly false representations to Tarmann than Tarmann." (*Id*. at p. 158.)

16

toward the public's right to protection from fraud, deceit, and unlawful conduct. [Citation.] Thus, California courts have consistently interpreted the language of section 17200 broadly.' " (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 877.)

In their opening brief, plaintiffs did not address their cause of action under the UCL. In supplemental briefing, however, plaintiff contend they have sufficiently alleged that Wells Fargo committed a business practice—"dual tracking"—that is unfair. They point to *Jolley*, *supra*, 213 Cal.App.4th 872, as authority that this business practice will support a cause of action for unfair business practices under the UCL.

*Jolley* was decided in the context of a motion for summary judgment brought by JP Morgan Chase (Chase), which had assumed the assets of its predecessor, Washington Mutual Bank (WaMu). (*Jolley*, *supra*, 213 Cal.App.4th at pp. 877-878.) There, the plaintiff and WaMu had entered into a construction loan, which WaMu agreed to modify in 2006 to permit the plaintiff to complete construction. (*Id*. at pp. 877-879.) The plaintiff alleged that before the modification, WaMu made false representations about certain matters, and that there were irregularities in the loan disbursements, causing delays in construction. (*Id*. at p. 878.) After Chase purchased WaMu's assets, the plaintiff continued to deal with the same people in the construction loan department and sought another loan modification. (*Id*. at p. 880.) He also dealt with a Chase employee who told him there was a high probability Chase would be able to modify the loan so as to avoid the foreclosure, the likelihood was good, and that it was likely when construction was complete he could roll the construction loan into a fully amortized conventional loan.

17

(*Id*. at p. 881.)  According to plaintiff, he was induced by these representations to borrow heavily to finish the project, and he claimed construction delays during the loan modification negotiations prevented him from selling the property before the housing market collapsed.  (*Ibid*.)

Rather than agree to a loan modification, Chase demanded payment in full and its trustee recorded a notice of default and then a notice of sale.  (*Jolley*, *supra*, 213 Cal.App.4th at p. 881.)  Plaintiff filed suit two days before the foreclosure sale, alleging causes of action for fraud, negligent misrepresentation, breach of contract/promissory estoppel, negligence, violation of the UCL, declaratory relief, accounting and reformation.  (*Ibid*.)  He also obtained a temporary restraining order prohibiting Chase from proceeding with the trustee's sale.  (*Ibid*.)

The trial court granted Chase's ensuing motion for summary judgment on various grounds, including that Chase, a lender, did not owe the plaintiff a duty of care.  (*Jolley*, *supra*, 213 Cal.App.4th at pp. 884-885.)  The appellate court reversed, however, as to the causes of action for fraud, breach of contract/promissory estoppel, negligence, violation of the UCL, and reformation.  (*Id*. at pp. 893-908.)  In reversing summary judgment on the plaintiff's UCL cause of action, the Court of Appeal focused in part on allegations indicating Chase had subjected the plaintiff to dual tracking, the "common bank tactic" whereby the lender pursues foreclosure at the same time it engages in loan modification negotiations.  (*Id.* at pp. 901, 904.)  The court observed that the California Legislature made dual tracking illegal effective January 1, 2018.  (*Id*. at pp. 904-905.)  Though it acknowledged the law did not apply and dual tracking was not forbidden by statute at the

18

time, the appellate court nevertheless held "the new legislation and its legislative history may still contribute to its being considered 'unfair' for purposes of the UCL . . . ."  (*Id*. at pp. 907-908.)

We decline to follow *Jolley* on this point.  First, we are not persuaded that the pleaded facts reflect a practice of dual tracking by Wells Fargo.  The second amended complaint alleges that Wells Fargo had notified plaintiffs on March 9, 2010 that it would *not* modify their loan, and further discussions regarding modification occurred two days later not because Wells Fargo had offered a loan modification, but because Gloria Aspiras initiated contact with Wells Fargo.  Even then, the pleading is entirely uncertain as to the identity of the person with whom Aspiras spoke, and his or her authority to make purported representations concerning the status of plaintiffs' loan and alleged preapproval.  At the time of the alleged foreclosure, plaintiffs were told their loan modification was "under review."  Even the March 24, 2010 letter did not constitute an approved loan modification, but an agreement that Wells Fargo would review their outstanding payments and fees to assess whether it would consider a modification.  These allegations and facts do not show Wells Fargo's process resulted in a " 'foreclosure[] even when a borrower has been *approved* for a loan modification.' "  (*Jolley*, *supra*, 213 Cal.App.4th at p. 904, fn. 20, quoting Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. on Assem. Bill No. 278, as amended June 27, 2012, p. 21.)

But apart from that deficiency, in our view, use of the Legislature's enactment of laws against dual tracking as the underlying basis for a UCL cause of action where the assertedly unfair conduct occurred before January 1, 2018, as here, is to effectuate an

19

improper retroactive application of the law.  Where a plaintiff predicates a claim of an unfair act or practice on public policy, it is not sufficient to merely allege the act violates public policy or is immoral, unethical, oppressive or unscrupulous.  (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1365.)  Rather, this court on numerous occasions has held that to establish a practice is "unfair," a plaintiff must prove the defendant's "conduct is tethered to an[] underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law."  (*Id.*, at p. 1366; *Levine v. Blue Shield of California* (2010) 189 Cal.App.4th 1117, 1137; *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147.)

Here, plaintiffs' operative complaint fails to state a claim under the unfairness prong of the UCL because they cannot allege Wells Fargo's alleged dual tracking, when it occurred in 2010, offended a public policy tethered to any underlying constitutional, statutory or regulatory provision.  (*Durell v. Sharp Healthcare*, *supra*, 183 Cal.App.4th at p. 1366.)  The trial court properly sustained Wells Fargo's demurrer to that cause of action without leave to amend.

### V.  *Negligence/Negligent Misrepresentation*

Again relying on *Jolley*, *supra*, 213 Cal.App.4th 872, plaintiffs in their supplemental briefing urge us to hold they have stated a cause of action for negligence; that Wells Fargo owed them a duty of care not to make misrepresentations to them regarding the status of their loan modification and foreclosure.  Our conclusions

20

concerning whether Wells Fargo should be deemed to owe plaintiffs a duty of care apply equally to their cause of action for negligent misrepresentation.[4]  (See *Eddy v. Sharp* (1988) 199 Cal.App.3d 858, 864 ["As is true of negligence, responsibility for negligent misrepresentation rests upon the existence of a legal duty, imposed by contract, statute or otherwise, owed by a defendant to an injured person"].)

"The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1095 (*Nymark*).)  Whether a duty to use due care exists in a particular case is a question of law to be resolved by the court.  (*Quelimane*, *supra*, 19 Cal.4th at pp 57-58.)

We decline to impose a duty of due care on Wells Fargo in handling plaintiffs' loan modification.  In California, "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as mere lender of money." (*Nymark*, *supra*, 231 Cal.App.3d at p. 1096; see also *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 34-35 [lender's liability to a borrower for negligence arises only when the lender " 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender' "]; *Ragland v. U.S. Bank Nat. Assn.* (2012) 209 Cal.App.4th 182, 206 ["No fiduciary duty exists between a borrower and lender in an arm's length transaction"].)  And we agree

---

4    The elements of negligent misrepresentation are the same as those for fraud with the exception of the knowledge requirement, which requires a defendant's representation to be made without reasonable ground for believing it to be true.  (*West v. JPMorgan Chase Bank*, *supra*, 214 Cal.App.4th at p. 792.)

with federal district courts that have held that "offering loan modifications is sufficiently entwined with money lending so as to be considered within the scope of typical money lending activities. If money lending institutions were held to a higher standard of care by offering a service that could benefit borrowers whose circumstances have changed, the money lender would be discouraged from leniency and would assert their rights to reclaim the property upon the borrower's default. The conventional-money lender test shall be sufficient to determine that there is no duty of care owed in servicing Plaintiff's mortgage loan and loan modification. As the Plaintiff is unable to establish a duty, it is unnecessary to discuss the elements of breach, causation, and damages." (*Alvarado v. Aurora Loan Services, LLC* (C.D.Cal. 2012) 2012 WL 4475330, *6; see also *Juarez v. Suntrust Mortgage, Inc.* (E.D.Cal. 2013) 2013 WL 1983111, *12.)

We acknowledge *Jolley* reached a different conclusion, but that case involved a construction loan, a critical distinction that renders *Jolley* inapposite. *Jolley* decided that the question of whether Chase owed a duty of care was not properly resolved by the general rule stated in *Nymark*, *supra*, 231 Cal.App.3d 1089. (*Jolley*, *supra*, 213 Cal.App.4th at pp. 898-899.) It applied the six-factor test of *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650, in which imposition of a duty of care by a lender to a borrower depends on a balancing of several factors, including the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm, plaintiff's injury, the connection between the injury and defendant's conduct, moral blame attaching to defendant's conduct, and the policy of preventing future harm. (*Jolley*, at pp. 899-902.) These factors, according to *Jolley*, favored a finding of a duty of care owed by Chase

22

under the specific facts of the case, where the relationship between the lender and borrower on a construction loan is "ongoing" with contractual disbursements made throughout the construction period. (*Jolley*, at pp. 900-901 & fn. 16.) In what we can only consider to be dicta, the *Jolley* court then expanded its analysis beyond lenders involved in construction loans and addressed the role and purported duties of a conventional lender.[5]

These circumstances do not involve a construction loan, and as we have stated, the handling of loan modification negotiations or servicing is a typical lending activity that precludes imposition of a duty of due care. To the extent *Jolley* addresses the roles and purported duties of a conventional lender, we decline to follow its dicta. (See *Gogri v. Jack In The Box Inc.* (2008) 166 Cal.App.4th 255, 272; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 509, pp. 572-573.)

---

[5]   The court in *Jolley* agreed that " '*Nymark* and the cases cited therein do not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within its conventional role as a lender of money.' " (*Jolley*, *supra*, 213 Cal.App.4th at p. 902.) It acknowledged the California Legislature's ameliorative efforts to assist homeowners at risk of losing their homes, and cited the existence and strengthening of those legislative measures as "demonstrat[ing] a rising trend to require lenders to deal reasonably with borrowers in default to try to effectuate a workable loan modification" and used them as an indication courts "should not rely mechanically on the 'general rule' that lenders owe no duty of care to their borrowers." (*Id*. at p. 903.) Though the court conceded the recently enacted laws against dual tracking did not apply, it nevertheless held that legislation "set[] forth policy considerations that should affect the assessment whether a duty of care was owed to [the plaintiff] at that time." (*Id*. at p. 905.) Thus, it concluded the trial court erred; that triable issues of fact existed as to the relevant considerations underlying a duty of care, which precluded judgment as a matter of law in Chase's favor. (*Id*. at p. 906.)

DISPOSITION

The judgment is affirmed.

                                                            O'ROURKE, J.

I CONCUR:


HUFFMAN, Acting P. J.


I CONCUR IN THE RESULT:


McINTYRE, J.

Filed 9/17/13

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HENRY ASPIRAS et al., | D061449 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2010-00088855-CU-BT-CTL) |
| WELLS FARGO BANK, N.A., | |
| Defendant and Respondent. | |

THE COURT:

The opinion filed August 21, 2013, is ordered certified for publication.

HUFFMAN, Acting P. J.

25