Filed 9/16/15  Odimbur v. Wells Fargo Bank, N.A. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| OKWUNI ODIMBUR, | B257219 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC443366) |
| v. | |
| WELLS FARGO BANK, N.A., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed.

The Law Office of Kelvin Green and Kelvin P. Green for Plaintiff and Appellant.

Litchfield Cavo, Edward D. Vaisbort, Edward C. Hsu for Defendants and Respondents.

_____

## SUMMARY

Plaintiff and appellant Okwuni Odimbur brought an action against her lender and other financial institutions arising from the 2010 foreclosure on her residence. Appellant contends on appeal that the trial court erred in sustaining without leave to amend respondents' demurrer to her third amended complaint. We affirm.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

We take our facts from the operative third amended complaint (TAC) and the attached exhibits.[1]

Appellant purchased a single family residence in Carson, California, in July 1991.[2] She refinanced the loan on her home in August 2004 and this refinanced loan was sold to respondent Wells Fargo Bank, N.A., doing business as respondent America's Servicing Company (ASC). The refinanced loan was secured by a deed of trust encumbering the property in the amount of $300,000. The loan required monthly payments of $1,896.20, which appellant stated she made from October 2004 until May 2009, when her employer, The World Evangelist Church of the Holy Trinity, was forced to reduce her salary from $3,500 a month to $1,500 a month. Appellant called ASC several times asking for a loan modification but was told that she was not under a "hardship" and nothing could be done until she missed three monthly payments. Appellant rented out the rooms in her home to help cover the deficit but it was not enough to cover her mortgage payment and other expenses, which included paying for her deceased sister's children's education.

On August 17, 2009, ASC caused to be recorded a notice of default, which stated that appellant's property was in foreclosure and that she had the right to bring her account to good standing by "paying all of [her] past due payments plus permitted costs and

---

[1] This Court granted appellant's motion to augment the record on appeal on January 13, 2015, and granted respondents' motion to augment the record on April 14, 2015.

[2] The deed of trust for the original loan indicated that appellant borrowed $171,000 in July 1991.

expenses" within the time permitted by law for reinstatement of the account. That amount was listed on the notice as "$12,366.36 as of 8/13/2009 and will increase until [the] account becomes current." The notice of default also stated that "payment has not been made of: The installment of principal and interest which became due on 4/1/2009 and all subsequent installments, together with late charges as set forth in said note[3] and deed of trust, advances, assessments, fees, and/or trustee fees, if any." According to the TAC, the notice of default was wrong because appellant had made her mortgage payments for April and May 2009, and was "only three payments behind (for June, July and August 2009)." Specifically, the TAC alleged that for her April 2009 mortgage payment, appellant on March 30, 2009, remitted a check for $2,000 made on an account she "maintained in the name of her employer," and for the May 2009 mortgage payment made on May 4, 2009, appellant remitted "$3654.35 by an electronic withdrawal to ASC from her 'Church' account."[4]

In a letter dated August 27, 2009, ASC sent appellant a proposed "Special Forbearance Agreement," which stated that appellant's "loan is due for 5 installments, from April 01, 2009 through August 01, 2009." The forbearance agreement required appellant to make four payments: the first for $1,110.00 on September 11, 2009, the second for $1,869.66 on October 11, 2009, the third for $1,869.66 on November 11, 2009, and the fourth for $1,869.66 on December 11, 2009. The forbearance agreement also stated that "[i]f your loan is in foreclosure, we will instruct our foreclosure counsel to suspend foreclosure proceedings once the initial installment has been received, and to continue to suspend the action as long as you keep to the terms of the [forbearance] agreement."

---

[3] The promissory note was not attached to the TAC or any prior complaint.

[4] Attached to the TAC were two pages of bank statements for the business interest checking account of World Evangelist Church of the Holy Trinity, the first page showing an entry for check No. 1404 paid on March 30, 2009, in the amount of $2,000.00, and the second page showing under the heading "Electronic & Miscellaneous Withdrawals" a May 4, 2009 entry, for $3,654.35 with the description "GEMB RSF CHECKPAYMT 1405." Appellant did not attach the cancelled checks.

According to the TAC, "[i]n reliance on this promise," appellant "prepaid all four installments and confirmed payment by letter (Exhibit '6')[5] stating: 'Per our conversation, I am forwarding the total of four months payments as we discussed because I am leaving on a missionary trip in a few days." Appellant's cover letter also stated that she would return from her missionary trip in January 2010 and follow up then.

On December 29, 2009, defendant NDEX West LLC (as the trustee under the deed of trust) recorded a notice of trustee's sale stating that appellant was in default and setting January 12, 2010, as the date of sale for the property. The notice stated that the "total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $299,818.55."

Upon her return from her missionary trip, appellant entered into a second forbearance agreement with ASC. In a letter dated January 22, 2010, appellant stated that per her conversation with ASC, payments should be deducted directly from her bank account and applied to monthly payments of: "1st payment for Feb 2010 [:] $2,444.00 (which [she] mailed to ASC separately . . .)[,] 2nd payment for Mar 2010 [:] $2,064.70[,] 3rd payment for Apr 2010 [:] $2,064.70[, and] 4th payment for May 2010 [:] $2,064.70." Appellant's letter also stated that "[s]ince you are taking the funds from my bank each month directly this time, we should not have the issues that we had previously where you placed a Trustee Sale on my home and the payments should be applied correctly." Appellant then noted that she would follow up when she returned from another missionary trip on July 23, 2010.

In a letter dated February 1, 2010, ASC sent appellant a second proposed special forbearance agreement and cover letter. The second forbearance agreement required appellant to make four payments: the first for $2,444.00 on February 12, 2010, the second for $2,064.70 on March 12, 2010, the third for $2,064.70 on April 12, 2010, and the fourth for $2,064.70 on May 12, 2010. Like the first forbearance agreement, the

---

[5] Exhibit 6, appellant's cover letter to ASC, is dated August 26, 2009, or one day before ASC's letter enclosing the forbearance agreement.

4

second one also stated in the cover letter that "[i]f your loan is in foreclosure, we will instruct our foreclosure counsel to suspend foreclosure proceedings once the initial installment has been received, and to continue to suspend the action as long as you keep to the terms of the [forbearance] agreement."

The second forbearance agreement stated that appellant's loan "is due for 8 installments, from July 01, 2009 through February 01, 2010." Appellant countersigned the second forbearance agreement on February 12, 2010, and then added a handwritten note on February 17, 2010, to the bottom of the agreement, stating: "I only owed or miss [*sic*] three monthly payment of $1,896.20 x 3 = $5,688.60. When I was waiting for your modification: I was paid from September 09, to or up to December 2009: I do not know, where ASC claiming from July 09 to January 10. I strongly disagree with your calculations of my past dues."

Appellant made the four payments required in the second forbearance agreement, attaching to the TAC a copy of a cashier's check for $2,444.00 dated as February 8, 2010, made payable to ASC and a bank statement showing a "TEL MORTGAGE PAYMENT" posted on March 15, 2010, for $2,064.70, and two entries described as "CUSTOMER CHECK" for $2,064.70 posted on April 14 and May 13, 2010. The TAC states that after these payments, her account had "sufficient funds left on deposit to cover the June 2010 installment," citing the bank statement, "leaving only the July 2010 installment to be paid after [appellant] 'return[ed] from [her] missionary trip on July 23, 2010.'" But appellant was never given "the chance to do so, because ASC foreclosed on July 16, 2010, for a credit bid by the foreclosing beneficiary of $304,547.60." The trustee's deed upon sale was recorded on July 22, 2010, and indicated that the "amount of the unpaid debt together with cost was $304,547.60."

5

On August 9, 2010, appellant filed her original complaint in pro. per.[6] Respondent Wells Fargo moved to quash service of the complaint and the trial court granted the motion.

On April 19, 2011, appellant (using her first attorney) filed her first amended complaint. Wells Fargo removed the case to federal court and on March 1, 2012, the federal court granted in part and denied in part Wells Fargo's motion to dismiss.[7]

On March 22, 2012, appellant (using her second attorney) filed in federal court her second amended complaint (federal SAC), naming two additional respondents and other defendants, and the federal court remanded the case to state court for lack of diversity. Respondents demurred to the federal SAC in the superior court, but because the federal SAC was never filed in the superior court, the court took the matter off calendar.

On August 26, 2013, appellant (using her third attorney) filed a new second amended complaint in superior court (state SAC). Respondents demurred and, on December 2, 2013, the trial court sustained respondents' demurrer to the entirety of the state SAC with leave to amend.

On December 9, 2013, appellant filed her TAC, which added several new causes of action. Respondents demurred to the causes of action from the state SAC and filed a motion to strike the new causes of action. On March 19, 2014, the superior court sustained without leave to amend the demurrer and granted the motion to strike the new causes of action in the TAC, finding they "were filed without leave of court." Judgment in respondents' favor was entered on April 23, 2014, and several defendants not parties to

---

[6] On August 19, 2010, appellant filed a notice of lis pendens and subsequently recorded it on August 23, 2010.

[7] See *Odimbur v. Wells Fargo Bank* (Mar. 1, 2012, CV 11-04581 DDP (JEMx)) 2012 U.S. Dist. Lexis 27198, 2012 WL 680057.

this appeal were dismissed on April 28, 2014. On May 1, 2014,[8] respondents filed and served notice of entry of judgment.

On June 30, 2014, appellant filed a timely notice of appeal.[9]

## DISCUSSION

On appeal, appellant contends the superior court erred in sustaining the demurrer without leave to amend as to two claims in the TAC: (1) breach of contract based on the foreclosure of appellant's property and the failure to pursue in good faith modification of her loan despite her payment under the forbearance agreements; and (2) if the forbearance agreements were not valid contracts, promissory estoppels based on appellant's justifiable and detrimental reliance on respondents' promises to stop foreclosure proceedings and modify the loan.[10] Appellant also seeks this Court's permission for leave to amend the TAC to allege causes of action for restitution or unjust enrichment, for violation of the federal Real Estate Settlement Practices Act (RESPA), title 12 United States Code section 2605(e)(1)(B), and for unfair competition under Business and Professions Code section 17200.

We affirm.

---

[8] Respondents also filed on May 1, 2014, a motion to expunge appellant's notice of lis pendens which was granted on June 4, 2014.

[9] Appellant, who was in pro. per. after substituting in to represent herself after her fifth attorney, elected to proceed by clerk's transcript, without designating additional documents, and without a reporter's transcript.

[10] Appellant does not challenge the portions of the superior court's order sustaining respondents' demurrer as to her causes of action for declaratory relief and cancellation of instruments nor does she challenge the superior court's grant of the motion to strike the five additional causes of action added in the TAC for accounting, fraud, violation of the Rosenthal Fair Debt Collection Practices Act, quiet title, and negligence.

7

## I. Standard of Review

We review the trial court's decision de novo. (*McCall v. PacifiCare of California, Inc.* (2001) 25 Cal.4th 412, 415.)

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

The court "may disregard allegations that are contrary to law or to a fact of which judicial notice may be taken." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 8:136.1, p. 8–102.2; *Fundin v. Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 955.) Furthermore, "[w]here the demurrer is to an amended complaint, the reviewing court may properly consider factual allegations in the prior complaints." (Eisenberg et al., *supra*, ¶ 8:136.1b, p. 8–102.2; *People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957.)

"The plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action. [Citation.] We will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings." (*Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1031; *Sui v. Price* (2011) 196 Cal.App.4th 933, 938.)

If the trial court sustains a demurrer without leave to amend, a plaintiff must demonstrate how the complaint could be amended to state a valid cause of action.

(*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) "'To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." [Citation.] . . . [Citation.] The plaintiff must clearly and specifically set forth the "applicable substantive law" [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action.'" (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1491.)

"An appellate court may . . . consider new theories on appeal from the sustaining of a demurrer to challenge or justify the ruling. As a general rule a party is not permitted to change its position on appeal and raise new issues not presented in the trial court. [Citation.] This is particularly true 'when the new theory depends on controverted factual questions whose relevance thereto was not made to appear' in the trial court. [Citation.] However, 'a litigant may raise for the first time on [303] appeal a pure question of law which is presented by undisputed facts.' [Citations.] A demurrer is directed to the face of a complaint (Code Civ. Proc., § 430.30, subd. (a)) and it raises only questions of law (Code Civ. Proc., § 589, subd. (a); [citation]). Thus an appellant challenging the sustaining of a general demurrer may change his or her theory on appeal [citation], and an appellate court can affirm or reverse the ruling on new grounds. [Citations.] After all, we review the validity of the ruling and not the reasons given." (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959.)

Appellant has not met her burden to show how she could amend either cause of action pled in her TAC or a new cause of action to establish every requisite element.

## II. Breach of Contract Claim

The elements of breach of contract are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.) We will affirm the order sustaining the demurrer if defendants negate any element and will affirm on any ground on which the demurrer can

9

properly be sustained, whether or not the trial court relied on proper grounds or the defendants asserted a proper ground in the trial court proceedings. (*Martin v. Bridgeport Community Assn., Inc.*, *supra*, 173 Cal.App.4th at p. 1031.)

### A. Alleged Promise to Suspend Foreclosure

Appellant argues that "[a]lthough it is unclear when the forbearance agreement would end,[11] it is clear that [appellant] kept her end of the bargain" and respondents breached their promise to suspend foreclosure on her property. If an ambiguous contract is the basis of an action and plaintiff alleges a construction of the contract that is not clearly erroneous, the court must accept that allegation as correct." (Eisenberg et al., *supra*, ¶ 8:136.1a, p. 8–101; *Marina Tenants Ass'n v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 128.) Here, the forbearance agreements are ambiguous as to when they terminate but appellant's contention that the agreements were still in effect on July 16, 2010, when respondents foreclosed on her property is clearly erroneous.

The letters accompanying the forbearance agreements state that ASC "will instruct our foreclosure counsel to suspend foreclosure proceedings once the initial installment has been received, and to continue to suspend the action as long as you keep to the terms of the forbearance agreements." Each forbearance agreement states that the agreement "temporarily accepts reduced installments or maintains regular monthly payments as outlined in section 5 below. Upon successful completion of the Agreement, your loan will not be contractually current." Section 5 in turn states "Each payment must be remitted according to the schedule below" and lists a plan payment number, the date the payment is due, and the amount of the payment. Specifically, section 5 in the first agreement provided for four monthly payments due on the 11th of each month from September 2009 to December 2009. In the second agreement, section 5 provided for four monthly payments due on the 12th of each month from February 2010 to May 2010. The agreements, however, warn "[i]f any installment is not received on or before the respective due date, the Agreement will be void . . . ." Thus, each monthly installment

---

[11] Appellant acknowledges that respondents "never promised indefinite forbearance."

10

payment under the agreement would result in forbearance until the next installment was due, but if that next payment was not made, the agreement would be "void" and the promise of forbearance would cease. Presumably, when the last installment payment was made, the forbearance agreement would be "complete" but even assuming that the last installment would also result in a forbearance of a month, the second forbearance agreement would have ended on June 12, 2010. Here, the foreclosure occurred on July 16, 2010, more than two months after the last payment.

In the TAC, appellant alleges that, after the final May 2010 payment under the second forbearance agreement, her bank account "had sufficient funds left on deposit to cover the June 2010 installment [citation], leaving only the July 2010 installment to be paid when [appellant] 'return[ed] from [her] missionary trip on July 23, 2010,'" but appellant does not allege that she authorized ASC to withdraw funds directly from her account for June or that appellant and ASC reached any agreement regarding a forbearance extending into June or July or the amount of the payment to be due for a June or July "installment."[12]

In her opening brief, appellant also argues that respondents had an "implied obligation to explain further actions" upon appellant's successful completion of the forbearance agreement. Assuming arguendo such a vague promise was made, enforceable and breached, it is unclear how this breach caused appellant harm. Appellant was out of the country until July 23, 2010—one week after the trustee sale of her property on July 16, 2010, and over two months after appellant completed the final May 12, 2010 payment provided for in the second forbearance agreement. She does not allege that she had provided respondents with an overseas address to contact her during her extended absence or that she contacted ASC during this time frame so that any explanation of "further actions" would have reached her before the trustee sale. Indeed, in her January 22, 2010 correspondence with ASC, arranging to make the four monthly

_____

[12] Indeed, appellant's allegations concerning her ability to pay the June and July 2010 "installment" implicitly acknowledge that without further payment the second forbearance agreement would not automatically extend into June and July.

11

payments from February 2010 to May 2010 under the second forbearance agreement, appellant simply indicates that "[w]e will speak again when I return from my missionary trip in July 23, 2010 so that I can follow up on these transactions." Thus, despite ASC's request in the letter accompanying the forbearance agreement, stating "During this period, we are requesting that you maintain contact with our office in order to establish acceptable arrangements for bringing your loan current," and that the last forbearance payment she had arranged to make was on May 12, 2010, appellant apparently did not plan to contact ASC again until July 23, 2010—or six months later. In a cause of action for breach of contract, the plaintiff must plead that the defendant's breach was a substantial factor in causing his or her damages. (See *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 247, fn. 3.) Appellant cannot allege that her damages were proximately caused by respondents' failure to "explain further action" before proceeding with foreclosure.

### B. Alleged Promise to Pursue a Loan Modification

Appellant argues on appeal that the TAC could be amended to allege a claim based on respondents' breach of their promise in the forbearance agreements to pursue in "good faith" a loan modification. Appellant also argues that, "although these forbearance agreements were not specifically designated a Trial Payment Plan, [respondents were] legally obligated to offer a loan modification under the [federal] Home Affordable Modification Program (HAMP)." Appellant, however, has failed to demonstrate how the complaint could be amended to state a valid cause of action based on these allegations. (*Schifando v. City of Los Angeles*, *supra*, 31 Cal.4th at p. 1081.)

The letters accompanying the agreements state that the agreement is "not a waiver of the accrued or future payments that become due, but a trial period showing you can make regular monthly payments. Please note that investor approval is still pending." Both the forbearance agreements and accompanying letters, after explaining that the installment payments may be less than the total amount due and appellant may still have outstanding payments and fees, state "[a]ny outstanding payments and fees will be reviewed for loan modification. If approved for a loan modification, based on investor

guidelines, this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement. An additional contribution may be required." The agreements then state in the next section, "The lender is under no obligation to enter into any further agreement, and this Agreement shall not constitute a waiver of the lender's right to insist upon strict performance in the future." The agreements further state that "The lender, in its sole discretion and without further notice to you, may terminate this Agreement."

Assuming arguendo that respondents breached a promise to pursue in good faith a loan modification, the agreements do not promise to offer appellant a loan modification or provide any indication what the loan modification might have been, assuming appellant was deemed qualified. Moreover, in an ASC "Financial Worksheet" dated July 1, 2009,[13] appellant updated her total income as $2,000 per month and her monthly expenses, *excluding her existing mortgage*[14] but including non-escrowed taxes and insurance, as $1,830 per month, calling into question whether appellant could have qualified for a modified loan even with the lower interest rate of "4-3.5" percent that appellant stated she needed. Any damages, therefore, would be speculative. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 473 ["It is fundamental that [contract] damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery"], disapproved on another ground in *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 352, fn. 17.)

With respect to HAMP, appellant does not contend "that the HAMP [modification] or other modification must be offered," but instead simply asserts "those programs must be considered." Appellant bases her arguments on *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780 (*West*) and its interpretation of a trial payment plan (TPP) under HAMP as incorporating United States Department of

_____

[13] The "Financial Worksheet" was attached as an exhibit to appellant's original complaint.

[14] Her existing mortgage payment was $1,896.20 per month.

13

Treasury's Supplemental Directive 09-01 under Civil Code section 1643 in order to make the TPP "lawful." (*West*, *supra*, 214 Cal.App.4th at pp. 797-798 ["To make the Trial Plan Agreement lawful, it must be interpreted to include the provisio imposed by Directive 09-01"].) Here, appellant concedes that she "never argued that the [forbearance] agreement was a 'Trial Period Plan'" and the record does not support construing the forbearance agreements as TPP's.[15] Accordingly, neither *West* nor Directive 09-01 control in this case.

To the extent appellant seeks to amend her complaint to assert a claim under HAMP generally, rather than a breach of contract claim based on a TPP incorporating HAMP regulations, courts have held that borrowers are not intended third party beneficiaries of HAMP contracts and have no right to enforce HAMP loan modification provisions. (See, e.g., *Pfeifer*, *supra*, 211 Cal.App.4th at p. 1282, fn. 17; *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547, 559, fn. 4 [stating that courts have uniformly rejected claims of homeowners trying to assert rights arising under HAMP and citing cases].)

## III.    Promissory Estoppel Claim

""""The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.'"" (*Advanced Choices, Inc. v. State Dept. of*

---

[15] Under Supplemental Directive 09-01, before a lender offers a TPP to a distressed borrower, the lender (1) has already found that the borrower satisfies certain simple threshold requirements under HAMP regarding the basic nature of the loan obligation, (2) has already calculated a trial modification payment amount using a "waterfall" method of specified steps that drops the borrower's monthly mortgage payment to the HAMP figure of 31 percent of monthly gross income, and (3) has already determined that it is more profitable to modify the loan under HAMP than to foreclose upon it. (*West*, *supra*, 214 Cal.App.4th at pp. 787-788; Supplemental Directive 09-01, *supra*, at pp. 2-5, 8-10, 14-18.) There is no indication in the record that any of these steps had been taken prior to offering the forbearance agreements and the agreements themselves do not suggest that they are TPP's.

*Health Services* (2010) 182 Cal.App.4th 1661, 1672.)" (*Aceves v. U.S. Bank N.A.* (2011) 192 Cal.App.4th 218, 225.)

Appellant relies upon the arguments she made in her breach of contract claim, noting that a promissory estoppel action "is identical to a contract action except there is a lack of consideration." Appellant makes no new arguments, other than a single sentence without citation about the relative bargaining strength of the parties—which we decline to address. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [court may treat as waived issue that was not supported by argument or citation to relevant authority].) For the reasons discussed, *ante*, the trial court did not err in sustaining the demurrer to this cause of action.

## IV.    Restitution Claim

Appellant next argues that she should be allowed to amend her complaint to state a cause of action for restitution or unjust enrichment. Appellant contends that respondents "received extra funds they were not entitled to at the expense of [appellant]," reasoning "[a]fter 5 years of making over $120,000 in payments, the property by necessity would have equity and the loan amount to Wells Fargo [Bank], N.A. would not have been more than the original $300,000 of the note." Based on a calculation using appellant's payments alleged in the TAC and a "standardized amortization schedule," appellant contends that the balance of the loan was $286,564.35[16]—not taking into account foreclosure fees which appellant states "would be minimal at best"—so that of the $304,547.60 that respondents recovered at the trustee sale, $17,938.23 was owed to appellant.

"Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred 'is an obligation (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by

---

[16] In her reply brief, appellant apparently corrects this number to $286,340.31 and then—based on her calculation of the foreclosure fees, statutory late fees and property taxes for one year—concludes the "total" amount owed to respondents was $293,423.32.

15

return of the thing or its equivalent in money.' (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1013, p. 1102.)" (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 346.) However, "an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter."[17] (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co. of Am.*, *supra*, 44 Cal.App.4th at p. 203; *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1388 ["A plaintiff may not . . . pursue or recover on a quasi-contract claim if the parties have an enforceable agreement regarding a particular subject matter"].) Here, appellant cannot pursue a claim for restitution because the determination of the amounts owed by appellant under her loan is a subject matter covered by contract—the promissory note and the deed of trust that secured the note.[18]

## V. Claim for Violation of RESPA

Appellant argues that she should be allowed to amend her complaint to state a claim for violations of RESPA, title 12 United States Code section 2605(e)(1)(B), based on respondents' failure to respond to two of her letters, which she contends were qualified written requests (QWR).[19]

---

[17] Benefits conferred under a contract may be subject to restitution if the contract is rescinded or determined to be unenforceable. (See 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 1042, pp. 1132-1133; *Lance Camper Manufacturing Corp. v. Republic Indemnity Co. of Am.* (1996) 44 Cal.App.4th 194, 203 [party to an express contract can assert a claim for restitution based on unjust enrichment by "alleg[ing in that cause of action] that the express contract is void or was rescinded"].) Here, there is no claim that the note and deed of trust were rescinded or should be determined to be unenforceable.

[18] Even assuming appellant intended to allege a breach of contract claim based on overpayment under the promissory note and deed of trust, appellant could not state a claim on the current state of the record as the promissory note is not in the record or a judicially noticed document and the TAC does not allege its salient terms, leaving unknown the amount and the kinds of charges, fees and penalties agreed to by the parties in the event of appellant's delinquency and default.

[19] Appellant in her reply brief attempts to allege that a third letter was also a QWR, after respondents raised this third letter as demonstrating that the prior two letters were

16

RESPA sets forth requirements for the servicing of mortgage loans, and among other things, requires a loan servicer to respond to a QWR from a borrower. (*Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 530 (*Jenkins*).) When violated, the statute permits a borrower to obtain any "actual damages to the borrower as a result of the failure" and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of [RESPA], in an amount not to exceed $1,000." (12 U.S.C. § 2605(f)(1); see 12 C.F.R. § 1024.21(f)(1)(i); *Jenkins*, *supra*, at p. 531.)

RESPA defines a QWR as a written correspondence that "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and [¶] (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." (12 U.S.C. § 2605(e)(1)(B).) The first letter appellant contends is a QWR is her January 22, 2010 letter to ASC—regarding her installment payments under the second forbearance plan—in which she stated, "[s]ince you are taking the funds from my bank each month directly this time, we should not have the issues that we had previously where you placed a Trustee Sale on my home and the payments should be applied correctly." The letter then thanks the ASC employee for explaining how to make the payments while appellant was out of the country and states that she will follow up when she returned in July 2010. We disagree that the January 22, 2010 letter is a QWR. The letter taken as a whole indicates that appellant's focus was to arrange payments on a second forbearance agreement during her absence from the country and does not indicate that she expected any response to her letter.

---

not QWR's and noting that appellant did not seek leave on appeal to bring a cause of action based on this third letter. We decline to consider this third letter as it is raised for the first time in the reply brief and no good cause is demonstrated for the delay. (See, e.g., *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3.) We also note that this third letter is dated July 29, 2010, after the trustee sale had been completed, when ASC would no longer have been appellant's servicer. As appellant acknowledges in her briefs, the "borrower-lender relationship ended" when "the loan was satisfied."

17

Rather, her letter suggests that she does not believe any further contact would be necessary by either party until after her return from her trip when she planned to speak with ASC to follow up on the payments made while she was out of the country. The letter does not state "reasons" appellant believes "the account is in error" or suggests that information is being sought.

The second letter appellant contends is a QWR is her handwritten note on the second forbearance agreement. In her note, appellant stated that she only missed three monthly payments as she had paid from September 2009 to December 2009 and that she did not know "where ASC claim[ed she was delinquent] from July 09 to January 10." She continued, "I strongly disagree with your calculations of my past dues." Assuming arguendo that the handwritten note is a QWR, appellant has not sufficiently alleged specific facts of actual damage resulting from respondents' failure to comply with RESPA.

"Asserting a defendant's failure to respond to a QWR and the suffering of general damages is insufficient to state a claim under RESPA. [Citation.] Instead, federal courts have read 12 United States Code section 2605 as requiring a plaintiff to plead specific facts showing both the defendant's failure to respond and the plaintiff's suffering of 'pecuniary damages' in order to avoid the dismissal of his or her RESPA claim. [Citations.] In effect, this pleading requirement has limited RESPA claims to circumstances in which a plaintiff can allege specific facts to show causation—'"actual damages to the borrower as a result of the failure [to comply with RESPA requirements]."'" (*Jenkins*, *supra*, 216 Cal.App.4th at pp. 531-532.)

Consequently, "harms generally resulting from a plaintiff's default and the foreclosure of his or her home" are not sufficient to plead actual damages under RESPA. (*Jenkins*, *supra*, 216 Cal.App.4th at p. 532.) Thus, in *Jenkins*, *supra*, 216 Cal.App.4th at pages 531-532, the court concluded that the plaintiff could not assert that her harms— "'devastation of her credit,' 'emotional distress related to the threatened foreclosure of her home,' 'late fees' and time spent attempting to avoid foreclosure"—were the result of

18

the defendant's failure to respond to the QWR "because she admits she sent the QWR months after her default and the receipt of the notice of default." (*Id.* at pp. 532-533.)

Here, appellant attempts to avoid the effect of *Jenkins* by alleging that she "faced the emotional strain and grief, constant anxiety of losing a home and deep emotional distress on a nearly daily basis. This anxiety was separate than that caused by the default as she thought things were going well and the improper accounting created new stress and grief." This allegation is insufficient to show "actual damages."

Preliminarily, such a conclusory allegation does not satisfy the requirement that appellant allege specific facts to show causation. Moreover, appellant's handwritten note on the second forbearance agreement concerned only her payments under the first forbearance plan and how they were applied. Appellant states she did not know "where ASC was claiming from July 09 to January 10," noting that she had "paid from September 09, to or up to December 2009." Thus, under her reasoning, she "only owed or missed three monthly payments," which the note suggests she believed to be July 2009, August 2009 and January 2010. The letter accompanying the forbearance agreement states that "[a]ny installments will be applied to the delinquent payments on the loan" and the agreement was not a waiver of "future payments that become due." Consequently, appellant's payments under the first forbearance agreement were to be applied to the five delinquent payments described in that agreement—"your loan is due for 5 installments, from April 01, 2009 through August 01, 2009," and not applied to the regular monthly mortgage payments that became due in the same month payment was made. But irrespective of how her payments were applied—to regular monthly mortgage payments as they became due or past due delinquent payments—appellant would have been aware that her single payment per month under the first forbearance agreement would not satisfy *both* the currently due payments and the delinquent payments. Like the plaintiff in *Jenkins*, appellant cannot assert her harms were the result of respondents' failure to respond to the QWR because she "sent the QWR months after her default and the receipt of the notice of default" (*Jenkins*, *supra*, 216 Cal.App.4th at pp. 532-533), and appellant had already entered into one forbearance agreement, was unable to bring her

loan current during the first forbearance, made no payment in January 2010, and was entering a second forbearance agreement after receiving a notice of trustee sale.

Appellant has failed to meet her burden to show that she can set forth factual allegations that sufficiently state all required elements of a claim based on a violation of RESPA.

## VI.    Unfair Competition

On appeal, appellant contends she should be allowed to amend her complaint to state a cause of action for unfair competition based.

"The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'" (*Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 252.) "[T]he California Supreme Court held that the UCL '"establishes three varieties of unfair competition— acts or practices which are [1] unlawful, or [2] unfair, or [3] fraudulent."'" (*Id.* at p. 253.) Since the UCL is written in the disjunctive, a business act or practice may be alleged to be all or any of the three varieties. (*Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1554.) In order to state a claim under the unlawful prong, a plaintiff must allege facts that show anything that can reasonably be characterized as a business practice is also a violation of law. (*People v. McKale* (1979) 25 Cal.3d 626, 632.) To show a violation under the fraudulent prong, a plaintiff must show that members of the public are likely to be deceived by the practice. (*Weinstat v. Dentsply Internat., Inc.* (2010) 180 Cal.App.4th 1213, 1223, fn. 8.) "A plaintiff's burden thus is to demonstrate that the representations or nondisclosures in question would likely be misleading to a reasonable consumer." (*Ibid.*)

Appellant alleges unlawful business practices based on violations of HAMP and RESPA. As we have concluded that appellant has not stated a claim for these alleged violations, appellant necessarily cannot characterize those business practices as a violation of law.

Next, appellant alleges that respondents engaged in an unfair business practice by not properly accounting for payments made under the forbearance agreements and argues

20

that "[a] fair business practice would be to properly account for money and explain how monies we[re] applied to the debt." As noted previously, the letter accompanying each forbearance agreement explicitly states that "[a]ny installments will be applied to the delinquent payments on the loan" and the agreement was not a waiver of "future payments that become due."

Appellant also alleges that respondents engaged in fraudulent business practices by engaging in "dual tracking" but concedes that "[d]ual tracking was not made illegal until after this foreclosure." Moreover, appellant's conclusory statements fail to specify the deceptive representations or nondisclosures and how they would likely mislead a reasonable consumer. Appellant has failed to meet her burden.

Appellant contends that respondents engaged in a fraudulent business practice by "not properly accounting for the trustee sale proceeds, the amounts owed, and not returning the differences" to appellant. Appellant's allegations, however, did not, as she contends, demonstrate that respondents "accounting was incorrect." Appellant's purported calculation of the loan balance in her briefs is flawed and incomplete on its face. Her calculations do not take into account various fees, charges and expenses agreed upon by the parties. For instance, the deed of trust states that the lender may charge appellant "fees for services performed in connection with [appellant's] default, . . . including, but not limited to, attorney's fees, property inspection and valuation fees." The notice of default states that, in addition to missed mortgage payments, also due were "late charges as set forth in said note and deed of trust, advances, assessment fees and or trustee's fees, if any." Again, appellant's calculations do not incorporate these amounts and, as already discussed, it is unknown if any other fees, charges and penalties were agreed to in the promissory note.

We have considered appellant's remaining contentions and find them to be without merit.

21

**DISPOSITION**

The judgment is affirmed.  Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


MOOR, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.